[No. 35455.   Department One.   January 5, 1961.]

THE STATE OF WASHINGTON, *Respondent*, v. HARRY LITTLE, *Appellant*.[1]

[1]*Reported in 358 P. (2d) 120.*

*Arthur R. Eggers*, for appellant.

*Arthur L. Hawman* and *Eugene T. Golden*, for respondent.

DONWORTH, J.—Appellant was charged with murder in the first degree. His trial resulted in his conviction of murder in the second degree. He has appealed from the judgment and sentence (entered upon the verdict) whereby he was sentenced to life imprisonment.

The pertinent facts which the jury could have found from the evidence may be summarized as follows:

Both appellant and Ross Johnson, the deceased, were inmates in the state penitentiary at Walla Walla on the date when the alleged crime occurred. In the early morning hours of May 25, 1956, a serious altercation took place be-

tween the two men in the dormitory of Eight Wing. The testimony is conflicting as to the cause of, and violence involved in, the altercation. In the course of this fight, appellant punched and kicked Johnson several times. As a result, Johnson sustained numerous injuries including extensive facial lacerations and bruises.

A short time thereafter, Johnson, while in a semiconscious condition, was removed by stretcher to the prison hospital. Dr. Jimmie Losey, the prison physician, examined Johnson at about 7:30 a. m. on the same day and diagnosed the injuries as a concussion with the possibility of a skull fracture and perhaps brain damage. Dr. Losey also testified that his examination of Johnson was impeded by the fact that he (Johnson) "was thrashing around . . . throwing his arms about." Within the next few days, X rays and a spinal tap were taken. According to state's medical testimony, these tests revealed both a linear skull fracture and a subarachnoid hemorrhage. Johnson was in a semiconscious condition for five days after the fight and on May 30th lapsed into a coma.

In light of these developments, Dr. Losey personally transferred Johnson (via the doctor's own station wagon, as the prison was not equipped with an ambulance) to Western State Hospital at Steilacoom for neurosurgery. Johnson died some twelve hours after his arrival at Steilacoom without any operation having been performed. The clinical cause of death, according to the testimony of Dr. Charles P. Larson (a physician and surgeon who was a consultant pathologist at Western State Hospital), who performed an autopsy on the deceased, was "cerebral trauma and meningeal hemorrhage, terminating in pulmonary edema." Of note, also, was the testimony of certain inmate nurses at the prison hospital indicating that Johnson had fallen from his bed on several occasions during the five days subsequent to his encounter with appellant.

Appellant urges six assignments of error, but we think that they present only three questions of law for our consideration: (1) Was it prejudicial error for the trial court to admit in evidence, over objection, the colored slides and

photographs of the corpse taken during the autopsy? (2) Did the court err in allowing witness Claude Kenaston to refer to his notes while testifying—notes not made contemporaneously with the events about which he was called upon to testify? (3) Was there sufficient medical testimony to support the jury's verdict that appellant's act was a proximate cause of the death of Ross Johnson?

Appellant's position with regard to the admission of colored slides and photographs into evidence is that these slides and photographs were not accurate representations of the body of the deceased immediately after the fight took place, since the slides and photographs were taken six days later at the autopsy. Appellant also urges that the trial court's alleged error could have been averted had the state called a third person (other than Dr. Larson who took the pictures), namely Dr. Losey, to point out and explain the differences, if any, between the injuries apparent on the body of Johnson immediately after the encounter and the injuries portrayed in the pictures. It is appellant's contention that the fatal injuries were sustained by Johnson, not in the encounter with Little, but because of repeated falls in the prison hospital.

Be that as it may, the admission or rejection of slides and photographs as evidence has been held many times by this court to lie within the sound discretion of the trial judge. See *State v. Hardamon*, 29 Wn. (2d) 182, 186 P. (2d) 634 (1947); *State v. Nyland*, 47 Wn. (2d) 240, 287 P. (2d) 345 (1955); *State v. Griffith*, 52 Wn. (2d) 721, 328 P. (2d) 897 (1958).

In the case at bar, the slides and photographs were introduced and used to amplify the relevant medical testimony of Dr. Larson bearing upon the cause of death and not upon the condition of the deceased after the altercation. The cause of death was not only a relevant but a vital issue for the jury's consideration. Appellant's argument properly relates to the weight of this evidence and not to its admissibility. See 73 A. L. R. (2d) 769 for a thorough analysis of this entire area of the law of evidence.

By way of preface to a discussion of witness Kenas-

ton's use of notes (the second question to be answered), a distinction must constantly be borne in mind between (1) refreshing recollection, and (2) a past recollection recorded. In the former situation, with which we are concerned here, the notes or memoranda used by the witness are not placed in evidence, but are u s e d to trigger his psychological mechanisms of recognition and recollection,[2] enabling the witness to then testify from his own memory. The testimony is the evidence, the writing is not. With respect to past recollection recorded, the notes or memoranda *are* the evidence, and it is only in this latter case that it is essential that the writing be made contemporaneously with the events described therein. Because the past recollection recorded *is* the evidence, there must be some assurances of accuracy, not the least of which is that the account be recorded at or near the time of the events described. However, as in the case before us, where the notes were used only to refresh the witness' memory, there is far less need (if any at all) to establish or insure the accuracy of the notes. Since the adverse party has the right to inspect the writing and to cross-examine the witness upon it, it is felt that these factors provide adequate safeguards for the prevention of coaching of witnesses—the most significant danger in this whole problem of refreshing recollection. *Cf. Rustuen v. Apro*, 40 Wn. (2d) 395, 243 P. (2d) 479 (1952). And see McCormick, Evidence, § 276; 3 Wigmore on Evidence 65, § 735. The use of notes to refresh the memory of witnesses must be closely supervised by the trial court, for, as in so many other fields of law of evidence, the sound discretion of the trial court is the most effective safeguard.

Appellant cites the case of *State v. Jensen*, 194 Wash. 515, 78 P. (2d) 600 (1938), to support the proposition that the notes used by a witness to revive his memory must have been made at or near the time the events about which he is testifying took place. All that the *Jensen* case held on this point was that a contemporaneous memorandum may be used to refresh the witness' memory, *not* that other writings

[2]Hutchins and Slesinger, Some Observations on the Law of Evidence— Memory, 41 Harv. L. Rev. 860 (1928).

whenever made cannot be used. See, also *Schmidt v. Van Woerden*, 181 Wash. 39, 42 P. (2d) 3 (1935).

█ In short then, the criteria for the use of notes or other memoranda to refresh a witness' recollection are (1) that the witness' memory needs refreshing, (2) that opposing counsel have the right to examine the writing, and (3) that the trial court be satisfied that the witness is not being coached—that the witness is using the notes to aid, and not to supplant, his own memory.

In the case before us, there was no showing by appellant that any of these three requirements were lacking with respect to witness Kenaston, a night officer at the penitentiary called upon by the state to testify only as to what he saw and as to who was present in Eight Wing when he arrived on the scene shortly after the fight.

█ The third and final question, that of proximate cause, is the most important one raised by appellant. This is basically a problem of definition—specifically, the meaning of *corpus delicti*. The *corpus delicti* so often alluded to in homicide cases is not the body of the corpse; it is the body of the crime and requires two elements: (1) The fact of death, and (2) a causal connection between the death and the criminal conduct of the accused. See 41 C. J. S. 5, § 312; *State v. Richardson*, 197 Wash. 157, 84 P. (2d) 699 (1938); *State v. Gregory*, 25 Wn. (2d) 773, 171 P. (2d) 1021 (1946). The supreme court of Vermont further amplified this definition in *State v. Rounds*, 104 Vt. 442, 160 Atl. 249 (1932) by stating that:

"In a homicide case, where the life or liberty of a citizen is at stake, and where the guilt of the accused must be established beyond a reasonable doubt, the causal connection between the death of the decedent and the unlawful acts of the respondent [accused] cannot be supported on mere conjecture and speculation. . . ." See, also, 31 A. L. R. (2d) 693.

Appellant admits, however, that the quality of medical care administered to the victim has no bearing upon the guilt or innocence of the accused in a criminal homicide case. See *State v. Baruth*, 47 Wash. 283, 91 Pac. 977 (1907); *State v.*

*Richardson, supra.* This is not to say, of course, that an unforeseeable intervening cause would not excuse the accused from legal responsibility. Malpractice with respect to the original injury or wound is no defense, whereas malpractice resulting in new and different injuries which prove fatal would be a defense.

From the evidence in the instant case, the jury could have drawn either one of two plausible conclusions regarding the events which culminated in the death of Ross Johnson. The first possible conclusion as to the cause of death was that the skull fracture and the extensive brain hemorrhaging were sustained by Johnson directly as the result of the violent encounter with appellant.[3] The second possible conclusion is that the fatal injuries were the result of one or more falls by Johnson from his bed while in the prison hospital.[4]

It is upon this second theory that appellant bases his argument on the issue of proximate cause. But even assuming that appellant is correct in his assumption that the fatal injuries were the result of the falls, a further question must be answered. The question to be answered is: Why did Johnson fall? The jury, if it found it necessary to consider the question, could have found that he fell because he was in a semiconscious condition and was in a bed without side rails or other means of restraint. There could be no doubt in the jury's mind that Johnson was in bed as a direct result of the beating administered by appellant. Dr. Losey, the attending physician, testified specifically that throughout the five-day period of medical treatment Johnson was incoherent and often "thrashing around." Also, other witnesses testified that Johnson was in this physical and mental condition immediately after the encounter with appellant.

The rule of law applicable to appellant's contention that Johnson's death was caused by the negligence of the at-

---

[3]The state's evidence was that appellant knocked Johnson unconscious with his fists and, while Johnson was lying on the floor, kicked him violently about the head and face eighteen or twenty times.

[4]An inmate nurse testified that Johnson fell out of bed five times, striking his head against the wall, against the radiator, or on the terrazzo floor. Dr. Larson testified that, in his opinion, Johnson's injuries could have been caused by such falls.

tendants while he was confined in the prison hospital is well stated in appellant's brief, where Wharton's Criminal Law and Procedure, Vol. 1, p. 449, is quoted as follows:

" 'The wrongdoer is not excused if the victim dies because he was careless in treating or neglected treating his wound, or the attending physician was negligent, unskilled, or made a mistake. The rule is founded upon the general principle that every person is to be held to contemplate, and to be responsible for, the natural consequences of his own acts. It may be said that neglect of the wound or its unskilful and improper treatment, which are of themselves consequences of the criminal act which might naturally follow in any case, must in law be deemed to have been among those consequences which were in contemplation of the guilty party, and for which he is to be held responsible. . . . ' "

On the basis of all the evidence referred to above, the jury was warranted in concluding that Johnson died as a direct result of the numerous punches and kicks inflicted upon him by appellant.

We have considered all of appellant's assignments of error and are of the opinion that he had a fair trial free from reversible error.

The judgment and sentence of the trial court are, therefore affirmed.

WEAVER, C. J., MALLERY, OTT, and HUNTER, JJ., concur.