RAMÓN MERCED ET AL., ETC., Plaintiffs and Appellees, *v.* GOVERNMENT OF THE CAPITAL OF PUERTO RICO and MARYLAND CASUALTY CO., DR. ANÍBAL LUGO and DR. RAÚL SALDAÑA SNIER, Defendants and the former two Appellants.

No. 299. Decided May 28, 1962.

*F. Fernández Cuyar, Jesús A. González,* and *Rafael A. González* for appellants. *Julio Suárez Garriga* and *Vicente Hita, Jr.,* for appellees.

Division composed of Mr. Acting Chief Justice Pérez Pimentel, Mr. Justice Blanco Lugo, and Mr. Justice Dávila.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

We decided "to review the judgment rendered by the Superior Court, San Juan Part ... only as to the compensation fixed by the trial court." The judgment appealed from granted the minor plaintiff $24,000 "for damages and physi-

cal sufferings and moral anguish" and to the minor's parents $8,000 "for the damages and mental anguish suffered." Appellants maintain that the amounts granted are excessive.

The cause of action filed arose from an accident suffered by Víctor Luis Merced Hernández, while he was playing in a park of the housing development "Extensión Las Casas" in Santurce. The Municipal Housing Authority of the Capital, entity in charge of the housing development "Extensión Las Casas," the Government of the Capital, and the doctors Aníbal Lugo and Raúl Saldaña Snier, employees of the municipal government, were sued for the alleged incompetency and lack of care and circumspection in the treatment of the fracture of the arm suffered by Víctor Luis.

Plaintiff "went up the 'slide' in order to slide down, and in one of its handrails which was loose at the end, he lost his balance and fell on the ground ... his left arm was caught under his body. He noticed that he had broken his arm and that a bone splinter was projecting from his skin." He was admitted to the Municipal Hospital. The clinical record shows that "he had compound fractures in the third half of the ulna (cubital) and radius bones of the left forearm with subsequent marked dislocation and slipping of the distal fragments."

We copy below from the pertinent part of the question which we are considering, the summary made by the trial judge of the testimony of the doctor who treated the minor:

"Upon examining [Víctor Luis Merced] he determined that it was a compound and comminuted fracture of the cubital (ulna) and radius bones of the left forearm in the third half. Both bones were exposed to the air in the ventral side of the forearm. There were wounds in the skin and maceration of the muscles and soft tissues. The exposed portions of the bones had dirt and in the cavities thereof there was contamination with the same dirt which covered the other osseous parts.

"The arm was completely deformed and its extremity was cold and bluish. This was a sign that the blood circulation had been seriously affected.

"It was undoubtedly a question of a serious fracture and the witness thought of the possibility of its requiring an immediate amputation.

. . . . . . .

"On Wednesday 26, in the morning, the witness was called at his home and was informed that the patient was in great pain. Doctor A. L. Lugo went to see him immediately and proceeded to make a drainage of sanguinolent matter accumulated by reason of the destruction of the muscles and soft tissues in the forearm. There was necrosis in some muscles and tissues of the forearm.

"The patient felt immediately better so much so that he fell asleep while he was being cured.

. . . . . . .

"In the morning of the 27th the witness was called again while he was in the hospital and when he saw the patient he found that there was evidence, without any doubt, of loss of circulation in the forearm, in the distal part to the fracture. There was toxemia throughout the body. He decided that amputation was required. This took place immediately, with the approval of the patient's relatives who were present in the hospital. It was done at a point above the elbow.

"It was a heroic measure. A choice had to be made between the life and death of the patient. Víctor Luis' parents so understood it when the situation was explained to them.

"Witness Dr. Lugo affirms in the course of his testimony of September 18, 1958 that the amputation of the arm was necessary because of various factors: He lists the following:

"1. Difficult circulation in the injured limb.

"2. Accumulation of secretions and blood in this limb.

"3. Secondary infections issuing from the affected area.

"Afterwards, the patient was seen on various occasions by Dr. Aníbal L. Lugo, until he was discharged, with the intention of resuming examinations in the clinics for 'ambulatory patients'.

. . . . . . .

"In order to get him an adequate artificial arm it was necessary to alter the amputation by another operation. The latter

was performed at Pavía's Hospital, where Víctor Luis Merced was admitted with charges to the Department of Health, under its program for crippled children.

"The operation required on that occasion was performed satisfactorily, and its post operative course was without incidents."

From Dr. Sabatelle's testimony it appears that "this type of fracture in which there is dislocation of the bones causes great pain." In fact, the evidence shows that the plaintiff suffered intense pain during the days which preceded the amputation of the arm.

By reason of the accident and the treatment and subsequent operations the minor lost two years of school.

The trial court declared the Municipal Housing Authority of the Capital, an entity in charge of the park where the accident occurred, liable. During the trial the action filed against the Government of the Capital and the doctors who treated plaintiff was abandoned. Is the Municipal Housing Authority liable for all the damages suffered by the minor, or on the contrary, is its liability limited to damages suffered by reason of the fracture, leaving aside the amputation of the arm and the sufferings which it caused?

In Restatement on Torts, 2 Torts, A.L.I., § 457, it is suggested that the rule applicable to the situation presented by the case at bar should be the following:

"If the negligent actor is liable for another's injury, he is also liable for any additional bodily harm resulting from acts done by third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or negligent manner."

And the first comment which appears after setting forth the rule refers to cases, like the one at bar, in which medical intervention aggravated the damages. It states to that effect: "In such a case, the damages assessable against the

actor include not only the injury originally caused by the actor's negligence but also the harm resulting from the manner in which the medical, surgical or hospital services are rendered, irrespective of whether they are rendered in a mistaken or negligent manner, so long as the mistake or negligence is of the sort which is recognized as one of the risks which is inherent in the human fallibility of those who render such services." See, also, *Balancio* v. *United States*, 267 F.2d 135, 137 (2d Cir. 1959) ; *Jess Edwards Inc.* v. *Goergen*, 256 F.2d 542 (10th Cir. 1958) ; *Trieschman* v. *Eaton*, 166 A.2d 892 (Md. 1961) ; *Bradshaw* v. *Iowa Methodist Hospital*, 101 N.W.2d 167 (Iowa 1960) ; *Couillard* v. *Charles T. Miller Hospital, Inc.*, 92 N.W.2d 96 (Minn. 1958) ; *City of Covington* v. *Keal*, 133 S.W.2d 49; Annotation, 126 A.L.R. 912 (1939) ; *Sauter* v. *N.Y. Cent. & H.R.R.R.*, 66 N.Y. 50 (1876) ; *Lyons* v. *Erie Railway Co.*, 57 N.Y. 489 (1874) and Annotations in 8 A.L.R. 506 and 39 A.L.R. 1268; HARPER & JAMES, The Law of Torts 1124, § 20.3, and compare with the doctrine prevailing in the penal law to the effect that "if a blow is given not necessarily fatal, yet the victim dies, the aggressor, the other necessary elements of crime concurring, may be held for homicide." *People* v. *Rodríguez*, 39 P.R.R. 840 (1929) ; *People* v. *Nieves*, 40 P.R.R. 367 (1929) ; *People* v. *Tilo, alias Franmachú*, 67 P.R.R. 463 (1947) ; *State* v. *Little*, 358 P.2d 120 (Wash. 1961).

 The existing difficulty in determining which damages come from the original negligence causing the damage and which come from the negligence of those who subsequently intervened, is the reason for this rule. PROSSER, Torts 224, § 45 (1955). Another difficulty pointed out is to adequately establish a case of professional liability if the aggravating is due to negligence in the treatment. It is stated that if the person who originally caused the damage could escape liability by alleging the negligence of the doctor,

the plaintiff would be left merely with an action of professional liability: "one of the most intricate and difficult to sustain in the field of damages." To overcome these difficulties, liability for the totality of the damages suffered is assigned to the first. Of course, nothing prevents the one who originally caused the damage to recover from the third person, who by his action increased the damages. See HARPER & JAMES, *op. cit.* at 1124, footnote 13.

PROSSER, in the work cited sets forth the reason for the rule thus:

"The question is primarily not one of the fact of causation, but of the feasibility and practical convenience of splitting up the total harm into separate parts which may be attributed to each of two or more causes... Where no such basis can be found, and any division must be purely arbitrary, there is no practical course except to hold the defendant for the entire loss, notwithstanding the fact that other causes have contributed to it."

That is the situation in the case at bar. It is practically impossible to determine whether the amputation of the arm became necessary due to deficient medical attention, or whether on the contrary, the nature of the fracture made the amputation necessary from the first moment and the doctor made an effort to save the arm by postponing the operation.

Thus, since the Housing Authority is liable for the damages suffered by the minor and taking into account all the sufferings of the latter—the amputation of the arm, having to use an artificial one for the rest of his life, the loss of his school terms, etc.—the compensation granted seems to us just and reasonable, but the one granted to his parents is excessive. It should be reduced to $3,000.

The judgment rendered by the Superior Court, San Juan Part, on February 19, 1960, is affirmed as to the compensation of $24,000 granted to the minor Víctor Luis Merced,

but it is modified, reducing to $3,000 the compensation granted to the parents of the latter, Ramón Merced and Cruz Hernández.

Mr. Justice Blanco Lugo concurs in a separate opinion.

---

MR. JUSTICE BLANCO LUGO, concurring.

Only our respect for the findings of fact of the trial judge and the limited scope of the writ of review issued by this Court, oblige me to concur in affirming the judgment. However, I can not keep from pointing out the conclusion which I reached after a careful reading of the transcript of evidence to the effect that the accident, with its final consequences, occurred when the minor plaintiff fell from a tree and not in the way in which the trial court found proved.

It always seems proper to repeat that the mission of weighing the evidence which devolves upon the trial courts is a very delicate one. Purely humanitarian consideration, such as that which concerns an injured minor before an insurance company which has issued a policy with high limits, should not weigh in the trier's mind when the panorama of facts decisively tends to support the absence of civil liability.