[No. 37138. Department Two. February 4, 1965.]

THE STATE OF WASHINGTON, *Respondent,* v. JAMES ALBERT
PLUMLEY, *Appellant.*\*

\*Reported in 398 P. (2d) 714.

*Lawrence M. Ross* (of *Johnson, Griffin, Boyle & Ross*), for appellant.

*John G. McCutcheon* and *Schuyler J. Witt,* for respondent.

WEAVER, J.—Defendant was charged with manslaughter. The asserted basis of the charge was that he mortally injured his 3-year-old stepdaughter "by striking and beating" her. The jury returned a verdict of guilty. Defendant appeals.

We summarize the salient facts which the jury could have found from the evidence.

At approximately 3 p.m. on January 1, 1963, defendant took his stepdaughter to the Mountain View General Hospital.

Dr. Harold Clure, the first doctor to examine her, testified:

"This child was unconscious at the time I first examined her. She was lying with her eyes partially opened. The eyes deviated to the left. She was noted to be quite rigid at examination in that if an attempt were made to flex her arms or her legs that she resisted this. She—her only response at that time was that of deep pain, and this only by general withdrawal motion, and this not at all times. She was noted to have multiple bruises about her body. There were several of which I recall particularly, one being the bruise that you can see on the child's chest, the anterior chest wall. And there was another over the tip of the chin. There was another bruise over the right temple and an abrasion on the left side of the head above the left ear."

The first diagnosis was that the child had suffered some intracranial damage and a neurosurgeon was called. Surgery was performed, but the child died.

The following day, Dr. Charles Larson, a pathologist, performed an autopsy. He described the multiple bruises upon the body of the child, calling attention to the "bruises over the upper surface of the abdomen." He found that the small intestine (duodenum) had been perforated; "the liver was almost literally torn in half . . . this tear went upwards into the sac that the heart is found in and the chest cavity"; peritonitis had developed.

Of the brain injury, Dr. Larson testified:

". . . There was nothing in the brain itself which in my opinion would have counted for the death of this child. The brain itself was not severely damaged in any portion of the brain. It was merely the hemorrhages which I have described here. . . ."

Of the abdominal injuries, he testified:

". . . It was my opinion from the examination of the abdomen and the injury in the abdomen that the cause of death was probably as much related to the damage to the abdominal organs as it was to the damage that I have already described to the brain and the meninges in the head. It's difficult sometimes to say exactly what kills a person or why a person dies, but in this case it is my opinion that the abdominal injury, or injuries I should say, were probably as much responsible for the death of this child as were the head injuries."

Dr. Larson could not, with exact certainty, fix the time the various bruises and injuries occurred, but the time limit was within the dates alleged in the information—between December 16, 1962 and January 1, 1963.

Except for defendant's written statement (the admissibility of which we discuss later), the state's remaining pertinent evidence consisted of the testimony of two police officers who interviewed defendant on several occasions. In short, they testified defendant told them: that he had quite a bad temper; that "he knocked her feet out from underneath her and that she landed on the floor on the back of her head"; that he had slapped her and it "left bruises around the eye area"; that he spanked her twice quite severely; that while spanking her he sometimes got "carried away" and "went too far and that he was rougher on her than he thought he was"; that he had picked her up and said "I shook hell out of her"; and that "he felt that 95% of the bruises on that child were his."

Dr. Larson testified:

"Well, of course head injuries can occur from relatively minor incidents in childhood, I mean children can fall and tumble off of bicycles and tricycles and receive head injuries. In my experience, however, this type of an injury com-

bined with a chest injury and abdominal injury is very uncommon to occur as a result of an accidental fall, unless it's a fall from a considerable distance and a considerable height. And also, in order to injure an abdomen you would have to fall on something that was protruding outward so that this could press upon the abdomen of the child and produce the tears and injuries that I have described to you here. In other words, just a fall on the floor in my opinion would not do this. It would have to be a fall on a protruding object of some type or other. I am not saying this can't be accidental, but I am saying in order for it to have been accidental it would have had to have been a fall against some object which was protruding, and it would have to be a severe fall against the unguarded abdomen which would produce these lesions which I saw in the abdomen. . . . Q. Could there be any other means of producing these injuries other than a fall, doctor? . . . A. Yes, these injuries could be produced by a blow of the fist or by a kick by a foot, a shod foot injury sometimes.
. . .

". . . Well an injury such as I observed in this autopsy would require a very violent blow and it would [be] almost inconceivable to me that this could have been occasioned by a child pedaling a pedal car inside of a home."

Further, Dr. Larson stated that all of the abdominal injuries could have been produced by one blow or one fall but that, in his opinion, either a single striking or repeated strikings of the girl's chest against the steering wheel of a pedal car could not produce the injuries sustained by the child.

With commendable thoroughness, counsel (court appointed for trial and appeal) makes 12 assignments of error. We find that two—the admission of defendant's written statement—and the state's failure to establish a prima facie case—are the heart of this appeal.

After defendant had talked to investigating officers on several occasions, he signed a written statement under oath in the form of an affidavit, identified herein as plaintiff's exhibit 5. The trial court treated it as a confession, excluded the jury, and held a hearing in accordance with Rule of Pleading, Practice and Procedure 101.20W, RCW Vol. 0, which relates to the admission of confessions. The

trial judge fully advised defendant and counsel of their rights under the rule. They refused, however, to participate in the hearing except to preserve objections to the procedure based upon the contention that exhibit No. 5 is not a confession.

After hearing testimony in the absence of the jury, the trial court concluded that exhibit No. 5 was a voluntary act of defendant; that there was no coercion, threats, promises or undue influence exercised upon him; and that defendant was not suffering from any mental or physical ailments that would detract from his mental capacity and the knowledge of the full consequences of the written statement. Exhibit No. 5 was admitted in evidence and read to the jury. The pertinent portion of it is set forth in the margin.[1]

---

[1] "She [defendant's wife] took her old job back with the Dairy Queen about December 16th. She was working part time and usually worked the night shift. On those nights she worked, I did the babysitting.

"There were occasions when Esther was working and I was babysitting that I reprimanded Carol Ann. I recall that I spanked Carol Ann quite severely a few days after my wife went back to work. I believe that on this occasion I held Carol Ann across my knee and spanked her with my open hand. I believe that the second spanking I gave Carol Ann occurred about a week to week and a-half later or a few days before Christmas. I held her by the hand while she was standing up and spanked her with my open hand on her buttocks. I recall that on both these spankings that Carol Ann was squirming and it's possible that I hit her on other parts of the body. I also recall that after each of these two spankings, I noticed bruises on Carol Ann's body and I realized that I had whipped her too hard. I don't recall now what prompted either of these two spankings. I feel that the biggest percentage of Carol Ann's bruises come from those two spankings. I'm not sure but sometime between the two spankings or during the two spankings that I picked Carol Ann up with my hands around her chest area and shook her. I would say that I did this either two or three times to her. I recall seeing bruise marks on Carol Ann's chest area and figured that it must be from the shakings I gave her.

"I can't recall how many spankings I gave Carol Ann after Christmas but I do remember slapping her on the face once while she was sitting on the davenport. A few days later I observed bruises on her face where I had slapped her. I don't recall what the reason was for this slapping. I also recall that sometime before Christmas I swatted Carol Ann on the butt with my hand and knocked her off her feet and she landed on her back. On one other occasion sometime previous to Christmas, I had instructed Carol Ann to put her pajamas on and when she

Since defendant urges the inadmissibility of exhibit No. 5 upon the authority of *State v. Gregory,* 25 Wn. (2d) 773, 171 P. (2d) 1021 (1946), we must examine the decision in some detail.

The body of a female baby, not more than 3 days old, was found on the city dump of Yakima. The child's death resulted from an incisive wound which penetrated the abdominal cavity through to the backbone. Ann Gregory was charged with murder. She admitted giving birth to the child, but claimed that when she went to sleep the evening of the birth the baby was alive, but that the child was dead when she awoke the next morning.

At trial, officers present at her oral examination prior to trial testified concerning inconsistent statements made by her as to the disposition of the baby. A stenographer then read the transcript of the examinations. It had been subscribed and sworn to by defendant. The transcript was then admitted in evidence over defendant's objection.

In holding its admission reversible error, this court said:

"It was admitted, doubtless, upon the theory that it embodied a *confession* by appellant of the offense charged. But the transcript, in this instance, was not admissible as a confession, for, throughout the examinations and at all times, appellant has steadfastly denied that she killed the child or *inflicted any injuries whatsoever upon it.* The evi-

---

just stood there, I gave her a shove, knocking her into the door jamb and I believe she hit the side of her head.

"On January 1, 1963, my wife had gone to work at 11:00 A.M. and I was home with the children. I baked a cake shortly after noon and Carol Ann licked the chocolate from the cake bowl. She then went to ride her little toy car and asked me to give her a push. I gave the car a push and it went into the kitchen and upset. She did this quite often as she wasn't used to driving the car. I helped her and she didn't appear to be affected as she started licking the cake bowl again. After ten to fifteen minutes and while still seated at the table licking the cake bowl, Carol Ann told me she wanted to lay down and take a nap. I told her all right but she appeared to be wobbly as she got off the chair so I went over and picked her up. I picked her up and started into the bedroom but discovered that she was limp. I then took her over to the davenport and laid her down and made an attempt to talk with her but she didn't answer and acted as though she didn't hear me nor saw anything although her eyes were open. I then called my wife at work and she told me to call the Doctor. . . ."

dence of her conflicting statements was, of course, admissible, but not so the transcript of the examinations. [citing authorities] . . . " (Italics ours.)

■ We do not find *Gregory* apposite. Nothing appears in the transcript of Ann Gregory's examination whereby she confessed participation in any part of the criminal agency which resulted in the baby's death. In the instant case, however, the nub of the crime with which defendant was charged was effecting the death of his 3-year-old stepdaughter by *"striking and beating"* her.

A reference to exhibit No. 5 (a portion of which is quoted in footnote 1) supports the conclusion that defendant confessed to striking and beating his stepdaughter. After compliance with Rule of Pleading, Practice and Procedure 101.20W, the court's admission in evidence of exhibit No. 5 was not error.

■ The court pointed out in *State v. Gregory, supra,* that there are two elements which go to make up the corpus delicti on a charge of manslaughter: (a) the presence and identification of a body, and the fact of killing; and (b) the criminal agency which effected death. In *State v. Little,* 57 Wn. (2d) 516, 521, 358 P. (2d) 120 (1961), a similar problem was discussed. The court said:

"The third and final question, that of proximate cause, is the most important one raised by appellant. This is basically a problem of definition—specifically, the meaning of *corpus delicti.* The *corpus delicti* so often alluded to in homicide cases is not the body of the corpse; it is the body of the crime and requires two elements: (1) The fact of death, and (2) a causal connection between the death and the criminal conduct of the accused. [citing authorities]"

In the instant case, the fact of death and the identification of the decedent are undisputed. A careful review of the record leads us to the conclusion that the evidence is sufficient to establish a criminal agency (the striking and beating) and a causal connection between it and the cause of death as described by the medical testimony. The state proved a prima facie case. The weight of the evidence was for the jury.

 Four pictures of the deceased child were offered; two were admitted in evidence. They were used to amplify the relevant medical testimony of Drs. Clure and Larson. We have said many times that admission of photographs, when properly identified and explained, lies within the sound discretion of the trial court. *State v. Swartos, ante* p. 335, 396 P. (2d) 971 (1964); *State v. Little, supra.*

A detective stated that defendant agreed to give a written statement to the police officers. When asked if he took the statement, he replied:

"Yes, we asked Mr. Plumley if he understood what a signed statement was. He stated that he did, that he had given the signed statement before with this department regarding another incident."

 Defense counsel moved to strike the answer and moved for a mistrial. The answer was stricken, the jury instructed to disregard it, and the motion denied. Cases involving inadvertent remarks of this nature are collected and discussed in *State v. Johnson,* 60 Wn. (2d) 21, 371 P. (2d) 611 (1962), wherein we said:

"The test is this: Did the inadvertent remark, which the jury was instructed to disregard, when viewed against the backdrop of all the evidence, so taint the entire proceedings that the accused did not have a fair trial?"

The other "incident" was not further identified nor reference made to it. In light of the entire record, we do not deem the inadvertent and unresponsive answer reversible error.

 Defendant contends it was error to permit Dr. Larson and one of the detectives to describe the bruises on the child's body after her death; that the evidence should have been restricted to the condition of the child when she left defendant's custody. We find no merit in this contention. The evidence was simply cumulative of Dr. Clure's testimony. The chronology of defendant's delivery of his stepdaughter to the hospital and of the hospital's emergency procedures was in evidence. The questioned testimony could not have misled the jury.

The remainder of defendant's assignments of error are directed to certain instructions given and requested instructions refused. It would unduly extend this opinion to set them forth verbatim. We have carefully considered these assignments and find them without merit.

The judgment is affirmed.

FINLEY, OTT, and HAMILTON, JJ., and BARNETT, J. Pro Tem., concur.

June 24, 1965. Petition for rehearing denied.