2016 JUN 13 AM 10: 47



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
) No. 72654-4-I
Respondent, )
) DIVISION ONE
v. )
) UNPUBLISHED OPINION
VINOD CHANDRA RAM, )
)
Appellant. ) FILED: June 13, 2016
)

APPELWICK, J. — Ram was convicted of conspiracy to commit identity theft and 16 counts of identity theft relating to a fuel card fraud scheme. He argues that the trial court erred in admitting a summary chart as substantive evidence and in permitting a witness to testify concerning a prior identification of Ram. We affirm.

## FACTS

Companies with fleets of large trucks, such as trucking companies, often use fuel cards to purchase fuel for their trucks. Fuel companies issue fuel cards that can be used to purchase fuel at "card lock" stations within the fuel company's network. A card lock station is an unattended fueling site. A trucking company's drivers can fuel their trucks at card lock stations by swiping a fuel card and entering their personal identification number (PIN) at a card reader.

Companies that use fuel cards receive regular bills for fuel purchases made using the fuel cards. These bills include the time, date, and location of each purchase. They also include the amount of fuel purchased and price paid. Some companies may require their employees to enter additional information at the card lock station, such as the odometer reading or truck number, in which case that information is included on the bill.

By April 2011, multiple companies across the state of Washington had reported unauthorized fuel purchases on their bills. Often, a single fuel card was used multiple times in one day to purchase more fuel than the truck could hold. One truck's fuel card was used to purchase fuel when that truck was being repaired. Companies that required an odometer reading or truck number noticed billing entries listing truck numbers that did not exist or impossible odometer readings.

After a lengthy investigation by the Washington State Patrol, the State brought charges against Vinod Ram, Manny Chuks, and Damiun Prasad in July 2013 for their involvement in this fuel card fraud scheme. They were charged with conspiracy to commit identity theft in the first degree and 18 counts of identity theft in the first degree. The charges related to 18 different victim companies and were based on events between August 2010 and August 2011.

Both Chuks and Prasad accepted plea agreements that required them to testify at Ram's trial. Chuks, an owner-operator truck driver, testified that he met an individual he knew only as the "gas man" through a friend in 2010. Chuks later identified the "gas man" as Ram. At first, Chuks purchased fuel for his truck at a

2

discount through Ram. Chuks's friend used a card to pay for the fuel, pumped the fuel, and gave Chuks and the other truck drivers directions. Then, Chuks paid Ram in cash for the fuel.

Chuks explained that Ram later asked him to help pump gas. Ram offered Chuks a better discount in exchange for his help. Chuks began using fuel cards and PIN numbers given to him by Ram to activate the fuel pump and help other truck drivers purchase discounted fuel. Chuks testified that sometimes these cards looked like normal fuel cards with writing and colors on them. But, sometimes they were completely blank with no writing or colors on them. And, sometimes a card would stop working, at which point Chuks would give it back to Ram. Chuks testified that he stopped working for Ram in June 2011.

Prasad also testified at Ram's trial. He is Ram's younger relative. Prasad became involved in this operation when Ram asked him for help fueling Ram's truck drivers' trucks. Prasad agreed to help. Ram would drive him to a gas station. Prasad would fuel up all the trucks. To pay, Prasad used fuel cards that Ram had given him and entered the PIN numbers Ram had given him. The drivers paid Ram. Eventually, Prasad stopped assisting Ram, because he became concerned that what they were doing was not legal.

Members of the Washington State Patrol team investigating the fraud also testified. They executed a search warrant of a home in Pacific, Washington, in January 2012. This home was in the name of Eva Gumiran, Ram's ex-wife. When executing the search warrant, the detectives found a card reader in a box in a bedroom and $35,000 in cash hidden in a rice dispenser.

3

Ram was convicted of conspiracy to commit identity theft and 16[1] counts of identity theft in the first degree. He appeals.

DISCUSSION

Ram challenges two of the trial court's evidentiary rulings: the admission of a summary exhibit and the admission of a witness's testimony regarding his earlier identification of Ram. This court reviews evidentiary rulings for an abuse of discretion. State v. Barnes, 85 Wn. App. 638, 658, 932 P.2d 669 (1997). Abuse of discretion occurs when the trial court's ruling is manifestly unreasonable or if the court exercised its discretion on untenable grounds. Id. The defendant bears the burden of proving an abuse of discretion. Id.

I. Summary Chart

Ram argues that the trial court erred in admitting exhibit 101, a summary chart prepared by Detective Sergeant Stacy Moate, as substantive evidence. He asserts that the admission of this chart was unfairly prejudicial.

Exhibit 101 is a 40 page chart that logs the unauthorized fuel purchases. The data is sorted into ten columns. The first six columns provide information from the victim companies' invoices: account name, date, time, location, quantity, and amount paid for each transaction. The next two columns list whether there is a surveillance photograph or video associated with the transaction and whether an individual had been identified in that footage. The last three columns indicate

---

[1] Ram was initially charged with 18 counts of identity theft in the first degree, relating to 18 different companies. The charge relating to one company was dismissed after an employee from that company failed to testify. Ram was acquitted of another charge.

whether telephone records show a call around the time of the transaction and the telephone number associated with incoming or outgoing calls in Chuks's records. The trial court admitted exhibit 101 as substantive evidence.

The underlying records that were summarized in Sergeant Moate's chart were also admitted into evidence via different forms. The trial court admitted invoices from all of the victim companies. Many of these invoices were marked by company employees to indicate the unauthorized fuel charges. Employees from each company testified as to which purchases were unauthorized. The trial court also admitted Chuks's telephone records as well as the telephone records of another truck driver, Fassil Gedlu. These records showed the time and date of incoming and outgoing calls or text messages. The court admitted surveillance photographs and videos taken at the card lock stations. And, the trial court admitted testimony from Chuks and Prasad identifying themselves in the surveillance footage.

ER 1006 provides,

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

For a summary to be admissible under ER 1006, the underlying materials must be voluminous such that in-court examination of them would be inconvenient. Barnes, 85 Wn. App. at 662-63. The original materials must also be authentic, and the summary must be accurate. 5C KARL B. TEGLAND, WASHINGTON PRACTICE:

EVIDENCE LAW & PRACTICE § 1006.3, at 404 (5th ed. 2007). The underlying materials themselves must be admissible as evidence. Id. at 405; see also State v. Kane, 23 Wn. App. 107, 110-11, 594 P.2d 1357 (1979). And, the underlying materials must be available to the other party. Barnes, 85 Wn. App. at 662-63.

These requirements were met here. In this case, all of the underlying materials—the invoices from the victim companies, phone records, surveillance videos, and identification testimony—were admitted into evidence. Ram does not challenge the admissibility of these underlying materials on appeal. Nor does he claim that they were unavailable to him.

And, the records were extensive: there were 17 victim companies with multiple, lengthy invoices. Combined, these invoices spanned an entire year. Many of the purchases in these invoices were not pertinent to the case against Ram. There were two binders of telephone records. And, there was surveillance footage recorded on many different dates at multiple card lock stations. Thus, the record establishes that these materials were voluminous, and in-court examination of them all would have been inconvenient. See United States v. Scales, 594 F.2d 558, 562 (6th Cir. 1979) (noting that Rule 1006 does not require it to be literally impossible to examine the underlying records, but rather permits a summary to be used when understanding multiple exhibits would be difficult without a chart).

The summary chart accurately captured the underlying records. Sergeant Moate testified that she simply copied the fraudulent transactions from the victim companies' invoices and arranged them chronologically. And, the trial court took precautions to ensure the accuracy of the summary. An earlier version of the

exhibit identified whether Chuks's or Gedlu's telephone records revealed a call to or from Ram. The trial court recognized that the record did not support labeling these calls as placed by or received by Ram. Even though Chuks and Gedlu associated a particular telephone number with Ram, another person could have made these calls using Ram's telephone. The trial court ordered the State to edit the exhibit so that it identified these calls by the telephone number rather than Ram's name. And, although Ram raised concerns that the placement of data in the chart suggested that specific telephone calls were linked to specific transactions, the trial court noted that Ram could easily address these concerns by asking Sergeant Moate whether this was the case.

Thus, exhibit 101 was admissible under ER 1006. However, Ram maintains that the summary was unfairly prejudicial. Ram contends that exhibit 101 was not objective evidence, because it summarized Sergeant Moate's investigation and her conclusions drawn from the evidence. He admits that a summary of the invoices and telephone calls would likely have been admissible. But, he argues that because this summary juxtaposed these records and included Sergeant Moate's opinions about whether Chuks or Prasad can be seen in the surveillance videos and photographs, exhibit 101 invaded the province of the jury. Ram contends that by including subjective inferences about the evidence, exhibit 101 amounted to a second closing argument for the State.

While exhibit 101 does juxtapose multiple types of evidence, we remain unpersuaded by Ram's argument that this juxtaposition invaded the province of the jury. The invoices, telephone records, and surveillance footage were all

7

admitted into evidence. By arranging these disparate records in the same document, Sergeant Moate merely organized the information into a single document. She did not express a subjective opinion that the underlying records were related; instead, she relied on the dates on the invoices, telephone records, and surveillance photographs and videos to assemble the chart in chronological order.

Nor did Sergeant Moate invade the province of the jury by providing opinion testimony regarding the identity of the individuals seen in the surveillance footage. A lay witness may give opinion testimony as to the identity of a person in a surveillance photograph so long as there is some basis to believe that the witness is more likely to correctly identify the person than the jury is. State v. George, 150 Wn. App. 110, 118, 206 P.3d 697 (2009). Here, Sergeant Moate testified regarding her identification of Chuks and Prasad in the surveillance photographs and videos. Sergeant Moate spent a lengthy amount of time investigating this case and interviewed both Chuks and Prasad. She was familiar with the people involved in this scheme. Moreover, both Chuks and Prasad were confronted with the surveillance footage on the stand and identified themselves. Therefore, we cannot say that the trial court abused its discretion in admitting exhibit 101 when it contained a column about whether someone could be identified in the surveillance footage.

Ram also argues that the trial court abused its discretion by sending exhibit 101 to the jury room without restrictions. When a summary is admitted as illustrative only, the jury should be instructed that it is not evidence, and the

8

summary should not go to the jury room. State v. Lord, 117 Wn.2d 829, 856, 822 P.2d 177 (1991). However, a summary admitted pursuant to ER 1006 is substantive evidence, and the jury may consider it during its deliberations. Id. at 856 n.5.

Here, the trial court admitted the summary as an exhibit, rather than illustrative evidence. The summary met the requirements of ER 1006. Consequently, the court did not need to instruct the jury that the summary was to be used for illustrative purposes only and not evidence. See Lord, 856, 856 n.5.

Exhibit 101 was properly admitted as substantive evidence under ER 1006. And, it was not unfairly prejudicial to Ram. We conclude that the trial court did not err in admitting it.

Moreover, even if the trial court did err in admitting this exhibit, such error was harmless. Ram asserts, without citation to authority, that by permitting the jury to use exhibit 101 in its deliberations, the trial court violated Ram's constitutional right to a fair trial. When the trial court violates an evidentiary rule rather than a constitutional mandate, we will not reverse unless there is a reasonable probability that it materially affected the outcome of the trial. State v. Thomas, 150 Wn.2d 821, 871, 83 P.3d 970 (2004), abrogated on other grounds by Crawford v. Washington, 451 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The improper admission of evidence constitutes harmless error if the evidence is of minor significance compared to the overall, overwhelming evidence as a whole. State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997).

9

Here, all of the evidence summarized in exhibit 101 was independently admitted at trial. The invoices, telephone records, and surveillance videos and photographs were admitted into evidence, and the jury was permitted to consider them during its deliberations. Witnesses from each company testified about the invoices, explaining how they knew certain purchases were fraudulent. The jury heard the testimony of Sergeant Moate, Chuks, and Prasad identifying Chuks and Prasad in multiple surveillance tapes. Further, multiple witnesses identified Ram as the leader in the fuel fraud scheme. And, a search of his ex-wife's home revealed a large amount of cash and a card reader.

We hold that even if the trial court erred in admitting this exhibit, there is no reasonable probability that exhibit 101 materially affected the outcome of the trial. Any error was harmless.

## II.    Asma Testimony

Ram contends that the trial court erred by allowing Michael Asma, a truck driver who purchased discounted fuel, to testify about his earlier identification of Ram. Ram argues that Asma's testimony should have been stricken, because Asma revealed on cross-examination that he did not have an independent memory of this event.

The State called Asma to testify about a time that he purchased fuel at a discounted price. In 2011, Asma was an owner-operator working for Associated Container Transportation. As an owner-operator, Asma owned his own truck and was responsible for purchasing his own fuel.

When prompted to discuss the details of the instance when he purchased discounted fuel, Asma could not remember. With the permission of the trial court, Asma repeatedly used an unadmitted police report to refresh his memory. Using the police report, Asma was able to recount the details of how he heard about the opportunity to purchase discounted fuel, how much money he paid for the discounted fuel, and whether other truck drivers also purchased discounted fuel.

Asma also testified regarding his identification of Ram in a photo line-up. He testified that he was shown six photographs, and he identified one of them as the person who sold him discounted fuel. Asma relied on exhibit 43, the photo line-up admonition, to refresh his memory about the position of the photograph in the line-up. And, he reviewed the unadmitted police report to remember what he told the officers about the person he had identified. The trial court admitted exhibit 43 and exhibit 18, the photo lineup itself, into evidence.

Ram argues that Asma's recollection was not refreshed by the police report, and the report does not meet the requirements for a past recollection recorded. Under ER 612, a witness may use a writing to refresh his or her memory while testifying. For a writing to be used for this purpose, the witness's memory must need refreshing, opposing counsel must have the opportunity to examine the writing, and the trial court must be convinced that the witness is using the writing to aid, rather than supplant, the witness's own memory. State v. Little, 57 Wn.2d 516, 521, 358 P.2d 120 (1961). In this situation, the witness's testimony is the evidence, not the writing. Id. at 520.

A writing used to refresh a witness's memory is distinct from a past recollection recorded. ER 803(a)(5) provides a hearsay exception for

> [a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly.

Unlike a writing used to refresh a witness's memory, the past recollection recorded is itself evidence. Little, 57 Wn.2d at 520.

Ram contends that Asma had no independent memory even after attempting to refresh his recollection, so his testimony was inadmissible hearsay. But, the trial court repeatedly admonished Asma that he was to tell the jury what he remembered, not read the report. The court stated multiple times that if Asma could not remember, he could look at the report to refresh his memory. Asma acknowledged that looking at the report jogged his memory. While on cross-examination Asma admitted that he was only able to remember the specifics of the fuel sales and identification because of what was contained in the report, this alone does not mean that the trial court abused its discretion in admitting Asma's testimony. This exchange could be interpreted as meaning that Asma did not recall these details until he refreshed his memory using the report, and he did not have an independent recollection as to matters outside the report. See State v. Huelett, 92 Wn.2d 967, 969-70, 603 P.2d 1258 (1979) (no abuse of discretion in admitting witness testimony as recollection refreshed even though witness stated he had no independent recollection beyond the notes in front of him). We decline to substitute our judgment for that of the trial court.

Additionally, Asma's testimony concerning his previous identification of Ram fell within a hearsay exception. ER 801(d)(1)(iii) provides that a statement is not hearsay if the declarant testifies at trial and is subject to cross-examination, and the statement is "one of identification of a person made after perceiving the person." Asma referred to the report when recalling how he identified a photograph in the line-up as being the "main guy" from the fuel purchase. A witness's statement of identification of a photograph falls within ER 801(d)(1)(iii). State v. Jenkins, 53 Wn. App. 228, 232, 766 P.2d 499 (1989). Therefore, Asma's statements regarding his identification of Ram's photograph in the lineup were not inadmissible hearsay.

Alternatively, even if the trial court did err in admitting Asma's testimony, the erroneous admission of hearsay evidence does not require reversal unless, within reasonable probability, the statement materially affected the outcome. State v. Greiff, 141 Wn.2d 910, 928, 10 P.3d 390 (2000). Here, Detective Ruth Medeiros of the Washington State Patrol also testified as to Asma's identification of Ram. Detective Medeiros stated that she met with Asma, explained the photo line-up process to him, and asked him to identify whether anyone in a series of six photographs looked familiar. She testified that when she showed Asma the fifth photograph, he immediately told her that was the man. The exhibits corresponding to Asma's identification of Ram were introduced into evidence.

Asma was not the only person who identified Ram as the man running the fuel card scheme. Chuks testified that he met Ram through a friend, Mousie, who was also a truck driver. Chuks explained that Mousie would make the

arrangements to purchase fuel, and they would pay Ram, who owned the fuel card. And, Chuks testified that he eventually started helping pump the fuel, at Ram's suggestion. When Chuks agreed to help, Ram would give him one fuel card at a time to use. And, Ram would tell Chuks the PIN numbers to use. If a card stopped working, Chuks gave it back to Ram.

Prasad also testified that Ram asked him to help Ram's truck drivers fuel their trucks. Prasad agreed to help, and Ram would drive him to the card lock stations. Ram would drop off Prasad with the truck drivers, Prasad would use a fuel card that Ram had given him and enter in the pin number, and the drivers would fuel their trucks.

Based on this evidence, there is no reasonable probability that the outcome of the trial would have been different if the trial court excluded Asma's testimony. Therefore, even if the trial court erred in admitting this testimony, such error was harmless.

We affirm.

WE CONCUR:

Trickey, ACJ

Appelwick, J.

Cox, J.