64 Wn.2d 523 (1964)
392 P.2d 613
MAXINE McCANDLESS, Appellant,
v.
INLAND NORTHWEST FILM SERVICE, INC. et al., Respondents.[*]
No. 36809.
The Supreme Court of Washington, Department One.
May 28, 1964.
Boose, Garrison & Hilling, for appellant.
Halverson, Applegate, McDonald & Weeks, for respondents.
HALE, J.
Sudden death on the highway one May morning is the beginning. An elderly woman and a 3-year-old child walking to the library died in collision with a truck while crossing the highway in the town of Mabton.
Highway 3-A takes a level route through farm and open country from Yakima to Prosser, traversing the heart of the lower Yakima Valley. It runs east and west through the corporate limits of the town of Mabton where Main Street of the town intersects it at right angles. Maximum speed on 3-A for passenger cars and light trucks was 60 *525 miles per hour generally, but reduced to 50 miles per hour by posted signs through Mabton and the Main Street intersection. In the center of the intersection hung a single traffic light, making a yellow blinking signal facing east-west traffic moving through Mabton on 3-A, and a red blinker signal facing traffic going north-south on Main Street.
At the intersection with Main, the highway is 41 feet wide, having 3 distinctly marked lanes, one for vehicles going west, one for vehicles going east, and a center lane marked for left turns.
On the west side of the intersection, traversing 3-A north and south, was a marked crosswalk 8 feet wide, delineated by two parallel lines and crosshatched with 6-inch diagonal stripes. The crosswalk represented an extension of the Main Street westerly sidewalk, except that it was black topped and depressed slightly where it went over the top of the shallow borrow pit or depression bordering the highway.
Plaintiff, mother of four children, operated a beauty shop in Mabton. She employed Melissa Pope, a woman in her sixties, to care for her children and keep house. With plaintiff's consent, Mrs. Pope and the youngest child, Brad McCandless, set out during the morning of May 11, 1960, to attend a Wednesday morning children's session at the public library.
Their route as pedestrians took them northbound along the west sidewalk of Main Street to its intersection with Highway 3-A. At the intersection, the elderly woman and the little boy entered the marked crosswalk and walked past the center of the highway, hand in hand, and were in the westbound traffic lane when they came into impact with the defendants' truck. Both were killed instantly.
Defendant Inland Northwest Film Company operated a regular route in the Yakima Valley and Tri-City area. William Upton, defendant driver, had driven this precise route several times a week for about two and one-half years and knew the highway well, having gone through this intersection during his tenure as a truck driver several *526 hundred times. He said that he customarily slowed his vehicle in this area not only for the sign, the yellow flasher, and the crosswalk, but, also, because numbers of school children frequently crossed the highway in this vicinity.
On this May morning, at close to 11 o'clock, he drove west toward Mabton on Highway 3-A in the Dodge truck. As he approached the intersection of Main Street, he observed no cross traffic and 3-A seemed clear of vehicles in both directions. He saw the woman and the boy; they were the only pedestrians in sight. He had been moving at 50 miles per hour, a lawful maximum speed for his unloaded Dodge truck, but says he lowered his speed to about 40 miles per hour at a "reduce speed" sign some distance before reaching the intersection area. He says that he first saw the elderly woman and the little boy when they were a foot or two outside and away from the edge of the highway, stepping into the crosswalk, moving from his left to right; he estimated his distance from them at the moment  according to his deposition  at some 200 to 300 feet and he observed them enter the crosswalk and walk toward the center of the highway. He saw them stop near the center and he assumed they would remain halted, so he proceeded on toward the intersection without sounding his horn or applying his brakes.
Too late to avoid them, he slammed on his brakes at a point where his skidmarks started within 5 feet of the east line of the crosswalk  leaving a strong inference that impact occurred before the rear wheel brakes took hold  and continued for a distance of 102 1/2 feet. At the same instant, in a desperate maneuver to avoid the pedestrians, he turned his wheels to the right and the truck careened along the side of the highway in the borrow pit and back onto the highway again.
Plaintiff, mother and legal custodian of the child, brings this action for wrongful death under RCW 4.24.010. She does not sue in a representative capacity.
At the close of all evidence, defendants moved for a directed verdict, and the court, finding that the elderly woman was guilty of negligence as a matter of law, held *527 it to be imputable to the plaintiff mother and granted a directed verdict for the defendants. Plaintiff appeals the judgment of dismissal entered upon the directed verdict.
Plaintiff's six assignments of error, considered in pari materia, and omitting those seemingly without merit, present two questions:
1. Was the pedestrians' negligence established as a matter of law, or did the yellow flashing light and the marked crosswalk so qualify the truck's arterial right of way as to make of the pedestrians' negligence a question of fact for the jury? and
2. Were defendant driver's statements, made into a nearby telephone shortly after the collision and while he was in a highly emotional condition, admissible as a part of the res gestae on his behalf?
As the pedestrians left the safety of the west sidewalk and approached the marked crosswalk, they faced a red flashing light in the center of the highway. This light, together with the posted stop sign, meant, to the vehicle driver and pedestrian alike, stop and yield the right of way. When they entered upon the marked crosswalk, they picked up the protection prescribed by RCW 46.04.290 and RCW 46.60.250:
"`Marked crosswalk' means any portion of a roadway distinctly indicated for pedestrian crossing by lines or other markings on the surface thereof." RCW 46.04.290.
"Pedestrians shall be subject to traffic control signals at intersections and the directions of officers discharging the duty of directing traffic at intersections. Where traffic control signals are not in place or not in operation, the operator of a vehicle shall yield the right of way, slowing down or stopping, if need be, to so yield, to any pedestrian crossing the roadway within a crosswalk when the pedestrian is upon the half of the roadway upon which the vehicle is traveling, or when the pedestrian is approaching so closely from the opposite half of the roadway as to be in danger, but no pedestrian shall suddenly leave a curb or other place of safety and walk or run into the path of a vehicle which is so close that it is impossible for the driver to yield...." (Italics ours.) RCW 46.60.250.
*528 Coming into the town of Mabton on the straight, level, high-speed highway, the truck had the right of way over cross traffic and pedestrians generally. But as it neared the intersection, the truck entered a lawfully-posted, reduced-speed zone, followed closely by a warning yellow flasher, and bore down upon a marked, visible and occupied crosswalk all of which the driver was bound to heed.
"Whenever, at any point, traffic is controlled by traffic control signals or signs exhibiting the words `Go,' `Caution,' or `Stop' or exhibiting different colored lights successively, one at a time, or with arrows, said lights, arrows and terms shall indicate and apply to drivers of vehicles and pedestrians as follows:
"...
"Flashing yellow: When a yellow lens is illuminated with rapid intermittent flashes, drivers of vehicles may proceed through the intersection or past such signal only with caution." (Italics ours.) RCW 46.60.230.
Each party claims preferential rights of way here according to the manner in which traffic devices or signals are classified by the statutes.
Plaintiff says that the blinker light is a sign, a traffic device (RCW 46.04.610); defendants, in answer, assert that the blinker lights were traffic control signals, citing RCW 46.04.600:
"`Traffic control signal' means any traffic device, whether manually, electrically, or mechanically operated, by which traffic alternately is directed to stop or proceed or otherwise controlled." (Italics ours.) RCW 46.04.600.
But we are unable to discern any significance to the name applied to the signal lamp whether it be designated a traffic control signal or a traffic device, even though both parties seem to make a great point of the designation.
[1] The label must yield in meaning to content. Every traffic sign, signal, lamp, light or device, or traffic control appliance, lawfully placed and operated by competent public authority, regulates the movement of persons, animals and vehicular traffic according to the dictates of the statutes authorizing it, and if the legislature uses different language *529 to designate the different categories of such equipment  but leaves the purpose and effect of the signals or devices clear  then the latter language governs. The message conveyed is what counts. For example, a pedestrian who enters a marked crosswalk in the face of a traffic signal commanding "Don't Walk" acquires no right of way at the time, but promptly regains the right of way when the signal changes to "Walk." Yet, during periods of the day when the electric traffic signals are out of action, the marked crosswalk remains as a signal that the pedestrian has the right of way.
[2] Each devices, whether it be a warning, a prohibition, or a command, should be given full effect in accordance with its statutory purpose at the place where employed. We do not think that the red flashing light in the center of the intersection, facing traffic and pedestrians on Main Street, served to erase the marked crosswalk. True, pedestrians using the crosswalk were bound to heed the warnings made by the signal light and the dangers implicit in the existence of an arterial highway, and they were likewise held to observe the admonitory language of RCW 46.60.250 not to suddenly depart from a place of safety into danger when using the crosswalk; but, once in the crosswalk, if in the exercise of due care in getting there, they were entitled to its protection.
Nor should the truck driver be permitted to ignore the many warnings of danger express and implied in the whole circumstance. He had a duty to heed the yellow flashing light facing him, the marked crosswalk across his route, and the presence of pedestrians about to enter it. He was bound under the provisions of RCW 46.48.010 to drive his vehicle at a rate of speed no greater than reasonable and proper under the conditions existing at that time and place so as not to unduly endanger others on the highway.
Genesis of the rules governing relative rights of way between pedestrians and vehicles at intersections may be seen in Franey v. Seattle Taxicab Co., 80 Wash. 396, 141 Pac. 890; Johnson v. Johnson, 85 Wash. 18, 147 Pac. 649; and Olsen v. Peerless Laundry, 111 Wash. 660, 191 Pac. 756.
*530 [3] In the latter case, we said:
"... Aside, however, from the question of right of way, we are greatly impressed with the idea that, had the driver used his horn, this accident would not have happened. Drivers of automobiles and auto trucks should know that the law will insist that they must sound their horns on all occasions where it can be said that, had such been done, an accident might or probably would have been avoided...."
In the instant case, questions of negligence and contributory negligence and proximate cause derive from a compound of many ingredients. Did the truck driver approach the intersection at an excessive speed? Did he reduce his speed sufficiently to accommodate the yellow flashing light and the marked crosswalk known by him to be at that place? Did he fail to exercise the ordinary prudence required of him as he observed the elderly woman and child about to cross, and in crossing, his route? Did his failure to sound his horn constitute a contributing cause of the accident? Would a driver in exercise of ordinary prudence have observed this crosswalk in Mabton at a point earlier than 200 or 300 feet from it? All of the questions are to be answered in the light of the law's requirements of ordinary care under the conditions then prevailing.
And, what of the woman and child? Did the elderly woman enter upon the crosswalk suddenly and without taking note of the obvious dangers? Was the truck sufficiently far distant from the crosswalk when she entered it that, in the exercise of reasonable care, she was without fault in making the crossing? Did she, by her conduct, claim more protection in fact from the crosswalk than the law allows? Would the sounding of the horn have saved her life and that of the child? Assuming that she gained the right of way upon entering the marked crosswalk, did her failure to heed the approaching truck a few seconds later show a lapse of ordinary care so as to deprive her of it?
And, if to these questions we add the problem of proximate cause, we see that the whole picture makes a case to *531 be decided by the jury. The language employed by us in Fedland v. Teshera, 40 Wn. (2d) 256, 242 P. (2d) 751, seems quite pertinent here:
"Since he started with the signal in his favor, by the provisions of § 6360-98, quoted above, he had the right of way over vehicular traffic on Holly street. We are of the opinion that, as he continued across in the pedestrian lane at his usual gait, he retained that statutory right of way until he reached the opposite corner, even if meanwhile the signal changed releasing vehicular traffic on Holly street.
"...
"From our examination of the evidence produced by appellant, we hold that he was not guilty of contributory negligence as a matter of law which was the proximate cause of his injuries and that appellant produced sufficient evidence of negligence on the part of respondent to carry the case to the jury."
[4] The contributory negligence of a parent having a child of tender years under physical dominion and control at the time of an accident is imputable to the child in an action by or for the parent. The same principle would undoubtedly apply as to any other adult person delegated by the parent to exercise physical dominion and control over the child. Vinnette v. Northern Pac. R. Co., 47 Wash. 320, 91 Pac. 975; Crevelli v. Chicago, Milwaukee & St. Paul R. Co., 98 Wash. 42, 167 Pac. 66; Annotation, 23 A.L.R. 670. If Mrs. Pope were contributorily negligent, her negligence under this principle would, therefore, be imputable to the plaintiff mother.
We thus conclude that the question of plaintiff's contributory negligence be submitted to the jury.
The other assignment of error requiring discussion has to do with evidence of an overheard telephone conversation admitted as part of the res gestae. Richard L. Powell, a fuel oil truck driver, while seated in the back room of Marge's Drive-In located at the intersection corner, did not see the collision, but on learning of it ran across the street to the place where it occurred. He first examined Mrs. Pope to ascertain if he could render aid and then saw *532 the defendant Upton "by the driver's side sitting down against the running board and shaking his head in a very nervous state, collapse." The witness said that he asked Upton if he was all right and "he said yes, but he was just trembling and shaking all over." The witness then went to where the boy lay on the highway and then back to the truck to talk to Upton again.
Mr. Powell continued:
"... the driver and I went to the other side of the truck to look to see how much damage was done to the film and load and then he asked where there was a telephone where he could call in and report his accident."
Powell said that Upton went over to the service station, located the wall telephone and dialed a number. The witness then said that, being a truck driver himself, he went purposely to overhear the conversation and he heard Upton describe the accident over the telephone:
"`She walked out from the road, hesitated and waited for me to go by and then took two or three more steps and waited for me to go by.'"
He said that Upton repeated three or four times that she stopped and waited for him to go by. He described Upton's condition at the time of the telephone call in such words as "nervous wreck" because his legs were "rubbery" and he seemed to collapse upon the counter. The witness added this further account of Upton's telephone conversation:
"Yes, and he repeated this two or three times, that she come out and stopped and then come ahead a step or two and stopped and waited for him to go by."
The foregoing testimony was admitted over objections that it constituted hearsay, was self-serving and not within the res gestae as offered; following admission, a motion to strike the evidence was denied.
[5] Res gestae means, literally, things or things happened. Therefore, to be admissible as an exception to the hearsay rule, words spoken, thoughts expressed, and gestures made, must all be so closely connected to the occurrence or event in both time and substance as to be a part *533 of the happening. Participating in subsequent events, engaging in acts, or speaking words which show opportunity for reflection, and the exercising of choice take away from the words spoken or thoughts expressed or gestures made that degree of spontaneity required to make it a part of the event or occurrence sought to be characterized. If the exclamations, or words, or gestures are not directly impelled by the happening, but may be separated from the act by intervening actions or the exercise of a choice or judgment, they cannot be deemed a part of the res gestae and are, therefore, hearsay.
[6] Beck v. Dye, 200 Wash. 1, 92 P. (2d) 1113, 127 A.L.R. 1022, fixes the minimal requirements for admissions of the statements or declarations under res gestae:
"... (1) The statement or declaration made must relate to the main event and must explain, elucidate, or in some way characterize that event; (2) it must be a natural declaration or statement growing out of the event, and not a mere narrative of a past, completed affair; (3) it must be a statement of fact, and not the mere expression of an opinion; (4) it must be a spontaneous or instinctive utterance of thought, dominated or evoked by the transaction or occurrence itself, and not the product of premeditation, reflection, or design; (5) while the declaration or statement need not be coincident or contemporaneous with the occurrence of the event, it must be made at such time and under such circumstances as will exclude the presumption that it is the result of deliberation, and (6) it must appear that the declaration or statement was made by one who either participated in the transaction or witnessed the act or fact concerning which the declaration or statement was made."
The overheard telephone conversation did not constitute a natural statement or declaration growing out of the event, but, on the contrary, contained a narrative of a past event, thus failing to measure up to the second element above stated. The statements were correlatively neither spontaneous nor instinctive utterances evoked or dominated by the transaction or occurrence itself, but made  even though under great emotional shock, stress and anxiety  *534 following inspection of the truck body and after walking to the service station and dialing the telephone number. Hence, the conversation failed to come within the necessities of element 4 above and possibly element 5.
We do not see any departure from the elements of res gestae as set forth in Beck v. Dye, supra, when we study our recent decision in May v. Wright, 62 Wn. (2d) 69, 381 P. (2d) 601.
We are, therefore, of the opinion that the testimony of Powell should have been excluded.
The record reveals to us no wanton or wilful misconduct on the part of driver Upton, and the trial court properly removed that phase of the case from the jury.
Other assignments seem to us without merit and will not be discussed.
Judgment reversed and new trial granted.
OTT, C.J., HILL, ROSELLINI, and HUNTER, JJ., concur.
NOTES
[*] Reported in 392 P. (2d) 613.