[Nos. 37710, 37919. En Banc. December 2, 1965.]

THE STATE OF WASHINGTON, *Respondent*, v. FRED HOWARD COLE, *Appellant*.

*In the Matter of* FRED HOWARD COLE, *Petitioner*, v. JACK D. PORTER, *Respondent*.*

*Reported in 408 P.2d 387.

*Bill Lanning* and *Robert S. Egger,* for appellant.

*Charles O. Carroll, Richard J. Glein,* and *David A. Berner,* for respondent.

*Will M. Derig,* amicus curiae.

HUNTER, J.—The defendant (appellant), Fred Howard Cole, was convicted of first-degree murder in the death of his former wife, Susan Nellis Cole. The jury did not inflict the death penalty. The trial court, on June 23, 1964, denied defendant's motion for new trial. This appeal followed.

Mrs. Cole was struck and killed the night of March 7, 1963, by two of three bullets fired by an unknown assailant through the kitchen window of the North Seattle residence she was leasing.

The defendant disappeared following the murder and was a prime suspect. The record reveals that after an extended and bitter divorce proceeding between the defendant and Mrs. Cole, he had been emotionally upset over the prospect that Mrs. Cole's motion to dismiss his appeal from the divorce decree entered in her favor on June 22, 1962, would be granted. The motion was scheduled for hearing in this court the morning of March 8, 1963, the day following the shooting.

A search instituted by Seattle police for the defendant was unsuccessful until some 8 months after the murder when they were notified that a man who gave his name as "Joseph Johnson," but whose fingerprints resembled those of defendant, had been arrested on November 8, 1963, and was being held in the New Westminster, B. C., city jail on a felony charge unrelated to the murder. Two officers from the Seattle Police Department's homicide and robbery detail, Acting Captain Dean R. Phillips, who was

in charge of the detail, and Sergeant Clayton Bean, drove to New Westminster on Saturday, November 9, 1963. They confirmed the identity of defendant and learned that he had been living in Vancouver, B. C., under the alias for most of the period subsequent to the murder. While defendant was being held in jail on the Canadian charge, the two officers began what from the record appears to have been a dual-purpose interrogation: (1) to elicit defendant's confession to the murder, and (2) to convince him to sign a waiver of extradition. They were successful, in part. During the third of three interrogation sessions (one Saturday night and two Sunday) the defendant signed a statement (state's exhibit 1) which, although it does not constitute a confession, contains admissions. He also signed the extradition waiver.

One of the two controversial tape recordings admitted into evidence in this case was made during the third interrogation session. The recorder was concealed in a brief case which Captain Phillips brought into the office where the interrogation was held. Defendant had no knowledge that his discussion with the officers was being taped.

On Monday, November 11, a holiday in British Columbia, the two Seattle officers returned to Seattle by automobile. The next day, Tuesday, November 12, the two officers, accompanied by Joel A. C. Rindal, the chief criminal deputy prosecutor for King County, returned by automobile to New Westminster. They had a warrant for defendant's arrest for the murder of Mrs. Cole. Following an arraignment and court hearing on the Canadian charge against defendant, he was released to the custody of the Seattle officers by Canadian authorities late Tuesday afternoon and the two officers, the deputy prosecutor and the defendant began the return trip to Seattle in a King County car.

The police officers planned to engage defendant in further conversation about the murder on the return trip and intended to make a second tape recording of same on Captain Phillips' briefcase tape recorder. Deputy Prosecutor Rindal was aware of this plan. Accordingly, all three

created a free-talking atmosphere for the purpose of getting defendant to "open up." Defendant still was unaware of the presence of the tape recorder in the briefcase.

At defendant's suggestion, they stopped for dinner in Blaine at a restaurant operated by friends of defendant. While there, defendant told the officers that an automobile he had driven north from Seattle was parked at a Blaine service station. They thereupon drove to the service station and Sergeant Bean left the three in the county automobile and drove the defendant's automobile back to Seattle. As Sergeant Bean drove off, Captain Phillips positioned the briefcase containing the concealed tape recorder in the back seat of the county car, between himself and the defendant, and turned it on; Deputy Prosecutor Rindal drove. For the next hour, approximately, the conversation was continuously taped. This tape, which was entered as state's exhibit 2, contained in the least, damaging admissions. Upon arrival in Seattle Tuesday evening the defendant was booked in Seattle city jail and then transferred to the county jail.

Defendant's primary contention upon this appeal is that he was denied constitutionally protected rights during the interrogation in the New Westminster jail, and later, upon the return trip to Seattle in the county automobile.

Defendant contends that he was denied the right to counsel in contravention of the sixth amendment to the federal constitution, made applicable to the states through the fourteenth amendment to the federal constitution. *Gideon v. Wainwright,* 372 U.S. 335, 9 L. Ed. 2d 799, 83 Sup. Ct. 792 (1963).

The first of several grounds that the defendant urges in this regard is that his request to contact a named attorney was refused while he was being held in the New Westminster jail.

The record shows that on Friday, November 8, 1963, the day of defendant's arrest in New Westminster, he requested Lieutenant Grace of the New Westminster Police Department to allow him to contact Attorney Robert Berst, in Seattle, and that Lieutenant Grace refused such request.

The record further shows that the defendant did not repeat the request to contact Berst when, the following evening, he first met with the Seattle officers, nor at any other time in his meetings with them. This was despite the fact that Berst's name was frequently mentioned in their discussions in connection with a meeting defendant held with Berst approximately two days after Mrs. Cole's death. Defendant also testified that he never requested any other attorney.

 Such denial, made by a Canadian police officer while defendant was being held in a Canadian jail on a Canadian charge, does not constitute a denial by the Seattle police.

The defendant argues, however, that the Seattle and New Westminster police were working in close cooperation at the time defendant's request was denied and that the Seattle police must have known of the denial. He argues that under these additional circumstances the denial, though actually made by the Canadian officer, nevertheless constituted a denial by the Seattle police.

This contention is without merit. There is no evidence in the record that the Canadian police officer was authorized to act for the Seattle police, nor that the Seattle police had knowledge of the denial of the defendant's request for counsel by the Canadian police officer.

A second ground that the defendant urges as denial of his constitutional right to counsel is that he was not advised of such right prior to the police interrogation, which he contends produced the damaging admissions in the statement and tape recordings. He relies mainly upon *Escobedo v. Illinois,* 378 U.S. 478, 12 L. Ed. 2d 977, 84 Sup. Ct. 1758 (1964) and *Haynes v. Washington,* 373 U.S. 503, 10 L. Ed. 2d 513, 83 Sup. Ct. 1336 (1963). Numerous circumstances bear upon this issue.

 Testimony of the Seattle police officers, which appears in the record and is uncontradicted therein, is that on August 9, 1963, upon meeting defendant for the first time, they asked him if he had an attorney and that he replied "no"; they then asked him if he intended to obtain an attorney. Defendant's reply according to the testimony,

was that he did not want anything to do with a "damned attorney." Defendant indicated that his attitude toward attorneys was due to unsatisfactory relationships he had experienced with attorneys in the past, especially in the long and complicated divorce suit which he defended, lost, and then appealed and which appeal was dismissed. Under the circumstances, the Seattle police would have been justified in concluding that he did not desire counsel and that further inquiry or advice would have been useless.

It further appears from the record that the defendant realized that he was not required to talk with the Seattle police officers and that he had the right to remain silent. The defendant stated in one point of the interrogation by Sergeant Bean: "I don't have nothing to tell you, particularly if you take that attitude."

Considering these circumstances cumulatively, it cannot be said that the defendant was denied the right to counsel, nor that the absence of advice of counsel resulted in his admissions in the statement and tape recordings. See *State v. Darst*, 65 Wn.2d 808, 399 P.2d 618 (1965).

A third ground that the defendant urges in support of his contention that he was denied counsel is that the two Seattle police officers and the Deputy Prosecutor failed to timely inform him that an attorney had been retained by his mother to represent him. The defendant cites *Escobedo v. Illinois, supra,* and *Haynes v. Washington, supra,* as authority in this regard.

It appears from the record that both the Seattle Police Department and the King County Prosecutor's Office had been notified that Horton Smith, Seattle attorney, had been hired by the defendant's mother to represent him. It further appears that the two agencies had been notified to contact the retained attorney upon defendant's apprehension. Deputy Prosecutor Rindal stated that he was aware of a letter requesting such notification. Nevertheless, defendant was not notified that his mother had hired an attorney for him until after the tape recording (state's exhibit 2) had been shut off during the return trip from New Westminster to Seattle. Further, such attorney was not notified of de-

fendant's apprehension until after the defendant had been returned to Seattle.

■ Although it would appear proper for the defendant to have been advised of his mother's activity in his behalf before the commencement of the interrogation, we do not believe that such failure was prejudicial to the defendant under these circumstances, where lack of desire for an attorney was so strongly indicated and where he refused any dealings with the attorney his mother had employed for him upon his return to Seattle. *Escobedo v. Illinois, supra,* and *Haynes v. Washington, supra,* upon which the defendant relies, are not apposite under the facts of this case.

The defendant next contends that the trial court erred in concluding at the close of the pretrial confession hearing that the statement (state's exhibit 1) was voluntarily made, and in submitting the question of voluntariness to the jury. It is defendant's position that the admission of such statement constituted a denial of defendant's privilege against self-incrimination, as protected by the fifth amendment to the federal constitution and made applicable to the states through the fourteenth amendment to the federal constitution. *Malloy v. Hogan,* 378 U.S. 1, 12 L. Ed. 2d 653, 84 Sup. Ct. 1489 (1964). He urges that the statement is inadmissible under the tests set out by the United States Supreme Court in *Haynes v. Washington, supra,* and *Malloy v. Hogan, supra,* in that the attendant circumstances show that the defendant's free will was overcome through threats, improper inducements and other forms of psychological coercion; he does not contend that physical force was utilized.

■ As heretofore stated the two Seattle police officers, Sergeant Bean and Captain Phillips, engaged in three separate meetings with the defendant while he was incarcerated in New Westminster. Each meeting took place outside the confinement of the jail. The first began at 10:30 o'clock the night of November 9, 1963, approximately 4 hours after the Seattle police officers first arrived. It concluded about 1:30 o'clock Sunday morning after 3 hours of questioning.

The officers returned some 9 hours later for what was the second session. The trial court found that it began at 10:30 o'clock Sunday morning and concluded at 1 o'clock or 2 o'clock in the afternoon. The officers returned for the third and final session, which commenced at 4 o'clock and ended at 10 o'clock, thus lasting 6 hours.

The record does not support the defendant's assertion that he was put to undue hardship by the foregoing interrogation timetable. Under the circumstances, the scheduling appears reasonable. He was afforded sleep and rest between sessions, had regular meals, was given coffee and cigarettes during the interviews and was taken to a restaurant during the final session.

The defendant contends that the Seattle police officers played upon his feeling for Linda Cole in an attempt to break down his will. Linda Cole was a girl who had been taken in by the Coles and raised as their daughter. She was living with Mrs. Cole at the time of Mrs. Cole's death. It appears that the officers indicated his unfairness in leaving Linda alone under the circumstances without keeping in touch with her. The defendant was in no way misled. This did not constitute the arousing of false sympathy, which was used as a means of threat or coercion in *Spano v. New York*, 360 U.S. 315, 3 L. Ed. 2d 1265, 79 Sup. Ct. 1202 (1959), cited by the defendant. This was an appeal to defendant's sense of reason and fairness, made in the hope that he would tell the truth about the entire affair. We do not find it improper.

The defendant contends that he was misled by misrepresentations of the police to the effect that if he remained in Canada he would be subject to the penalty of life imprisonment and the "lash" under the Canadian charge; that he was therefore coerced into signing the statement (state's exhibit 1) and waiver of extradition to avoid prosecution by the Canadian authorities.

The record shows that conversations took place in which Canadian representatives as well as the Seattle police officers advised the defendant that the penalty for the Canadian charge was life imprisonment, and that it was

implied that the "lash" was a possible punishment. Whether this was a misrepresentation cannot be determined from the record before us and the defendant has therefore failed to sustain the burden of this contention. In any event, from the tape recording (defendant's exhibit 3) it appears that he did not believe these representations as to the penalty. It is, however, clear from the record that the defendant concluded it would be better for him to return to the United States where he had friends rather than remain in Canada and face the Canadian charge. Whether he signed the statement (state's exhibit 1) voluntarily for this reason in the exercise of his own independent judgment, or whether it was a result of the overcoming of his free will is the crucial question for determination.

The defendant admitted in his testimony at the trial, that he made the decision to sign the statement of his own free will although he asserted the statement was not true. The fact that he asserted the statement was not true is not material as we are concerned only with the question of the voluntariness of the statement in determining its admissibility.

The trial court, having the benefit of hearing the defendant at both the pretrial hearing and during the trial, held the statement to be voluntary, stating:

> there is no evidence that he was coerced to such an extent that the Court might feel that he made the statement in order to relieve himself of any pressure that was being put on him, or that he made the confession in order to escape bodily harm. The evidence is that he made the decision because he thought he would like to come back to the States, rather than going through the problem of being tried up in Canada, which is a calculated and intelligent decision that he made.

The jury in answer to special interrogatories found the statement was voluntarily made and was not caused by duress or fear produced by threats.

In the instant case we are in the unique position of having been able to listen to the conversation contained in the tape (defendant's exhibit 3), to hear the inflection and tone of the defendant's voice in determining its sin-

cerity, and to observe the ease and freedom of conversation. After listening to the tape we are satisfied that the admissions contained therein, which were later reduced to writing in the statement, were free and voluntary. In view of the entire record we are convinced that the statement of the defendant was the product of his own free will, and that the trial court and the jury were correct in making this determination.

■ The defendant further argues, however, that the statement (state's exhibit 1) was inadmissible for the reason that Captain Phillips admitted the free will of the defendant was overcome in obtaining the statement. The testimony referred to was elicited in cross-examination in reference to whether the free will of the defendant was overcome through harassment in the interrogation. Captain Phillips answered: "Possibly we did overcome his free will." This was no more than the conclusion of a witness, to be considered with other evidence in the case. We find it inconclusive in view of the admission of the defendant to the contrary and after consideration of the record in its entirety.

The defendant also contends that the Seattle police officers falsely represented he would have a good defense in Washington and that this was a factor in inducing him to sign the statement. The contention refers to the statements of the officers to the effect that the state of mind of a defendant can be shown by res gestae. We find no misrepresentation in this regard. *McCandless v. Inland Northwest Film Serv.*, 64 Wn.2d 523, 392 P.2d 613 (1964).

For the reasons heretofore stated we hold that, by the admission of the statement of the defendant (state's exhibit 1) in evidence, the rights of the defendant under neither the provisions of the fifth amendment nor the due process clause of the fourteenth amendment to the federal constitution were in any way thereby violated.

■ The defendant contends that state's exhibit 2, the tape recording of the conversation which took place in the county car while the defendant was being transported to Seattle, violated his privilege against self-incrimination, as

protected by the fifth amendment to the federal constitution and made applicable to the states through the fourteenth amendment. *Malloy v. Hogan, supra.* Defendant relies upon *Massiah v. United States,* 377 U.S. 201, 12 L. Ed. 2d 246, 84 Sup. Ct. 1199 (1964). This contention is without merit. The statements under attack in that case were obtained after indictment while the accused was out on bail when the accused confided to a codefendant with whom he thought he was on friendly terms. Unknown to the accused the codefendant was cooperating with the police and had been equipped with a radio listening device through which the police heard their conversation. Here, the defendant knew that he was engaging in a conversation with someone who would later be a witness against him. Tape recordings made under such circumstances as those present in the case at bar are not inadmissible, *State v. Spencer,* 74 Idaho 173, 258 P.2d 1147 (1953); *People v. Dupree,* 156 Cal. App. 2d 60, 319 P.2d 39 (1957); *State v. Driver,* 38 N.J. 255, 183 A.2d 655, 672 (1962); Annot., 97 A.L.R.2d 1283, 1305; 20 Am. Jur. *Evidence* § 258.

The defendant contends that the trial court erred in granting the state's motion to dismiss count 1 of the information. The record shows that the defendant was originally charged in count 1 with the crime of conspiring with one Jenkins to commit murder in the first degree, and in count 2 with the crime of murder in the first degree.

The defendant argues that by removal of the designated accomplice, Jenkins, from the case, he was denied a valuable cautionary instruction relating to accomplices. This argument is without merit. There was no basis or need for a cautionary instruction as to an accomplice's testimony after the conspiracy charge was dismissed, and in the absence of evidence establishing that Jenkins was an accomplice. *State v. Bixby,* 27 Wn.2d 144, 167, 177 P.2d 689 (1947).

The defendant contends that the trial court erred in granting the state's motion to amend the remaining count 2 in the information, for the reasons that the amendment was made at the time of trial, that he was thereby prejudiced

in the preparation of his defense, and was further denied the opportunity to enter a plea to the amended information.

■ The amendment consisted of the deletion of certain language relating to the consideration of the first degree murder charge in the information in connection with the conspiracy charge. After the dismissal of the conspiracy charge the deleted language would have been meaningless and confusing. It was therefore proper for the court to grant the state's motion for the amendment. The substance of the charge in the remaining count was in no manner modified. It was unnecessary for the defendant to again be arraigned, and the amendment of the information was in no manner prejudicial to the defendant.

The defendant contends that the trial court erred in admitting in evidence the state's exhibit 40, which consisted of a lunch box containing some cartridges, on the grounds that neither the lunch box nor its contents was identified as having any connection with the defendant. The record shows that the building in which the lunch box was found was a building previously occupied by the defendant and his former business associate, Mr. Harold Roberts, for the purpose of storing their tools. Mr. Roberts testified that the building was kept locked and the only persons who had keys to the building were the defendant and himself. Roberts further testified that the lunch box was found by his son in the area that was occupied by possessions belonging to the defendant; that he (Roberts) did not own a lunch box; and that the lunch box was removed by his son and was left in the Roberts' garage where it remained until shortly before the trial when it was delivered by Roberts to the authorities.

The trial court held the objection went to the weight of the evidence rather than the admissibility. We agree. The admissibility of the exhibit was within the discretion of the trial court. The trial court did not abuse its discretion in view of the foregoing evidence. It was within the province of the jury to give the evidence admitted the weight to which it deemed it was entitled.

The defendant contends that the trial court erred in failing to exclude the testimony of Billy Dunigan, who testified as an expert in comparing one of the bullet slugs found at the scene of the crime with one of the shells contained in the lunch box.

 This assignment of error goes to the qualifications of Billy Dunigan as an expert witness. It is well settled that the qualifications of an expert witness are primarily for the trial court to determine. *State v. Kennedy,* 19 Wn.2d 152, 142 P.2d 247 (1943). From our examination of the record we find no abuse of discretion by the trial court in making this determination.

The defendant contends that the trial court erred in failing to grant the defendant's motions for mistrial because of misconduct of Deputy Prosecutor Rindal.

The defendant contends that by admission of the state's exhibit 2, wherein the Deputy Prosecutor participated in a conversation between Captain Phillips and the defendant, that Rindal was in effect a witness and the weight of the prosecutor's office was thereby placed in support of his credibility. We disagree. The participation of Mr. Rindal in the conversation was slight and did not constitute the assertion of facts before the jury. His credibility as a witness in this respect was not in issue.

The defendant contends that the Deputy Prosecutor, during his argument to the jury, committed misconduct in reading from a transcript not in evidence containing the contents of defendant's exhibit 3, and that the trial court erred in denying the defendant's motion for mistrial. This was a matter within the discretion of the trial court. We cannot say that the trial court abused its discretion in this instance.

The defendant further contends that the Deputy Prosecutor committed misconduct by showing one of the exhibits to the jury, a death picture of the deceased, and in making certain inflammatory remarks in regard thereto, in his closing argument, at which time a motion for mistrial was made which the court denied. This is again a matter within the discretion of the trial court. The remarks were

improper but appear to have been invited by the defense counsel in his argument to the jury. We cannot say, under all the circumstances of this case, that the trial court abused its discretion in denying the defendant's motion.

The defendant finally contends that the court erred in asking counsel whether there were any objections to a tape recording, defendant's exhibit 3, being played on the recorder in the jury room. The Deputy Prosecutor replied, "In fact, I would urge it." The defense counsel remained mute. The court then stated, "Well, the jury will retire to the jury room while we discuss this."

The defendant contends that this was extremely prejudicial, since it placed him in the position of appearing to hide something.

The record shows that the colloquy developed by reason of the defense counsel's request at the close of the state's final argument that defendant's exhibit 3 be played to the jury. The recorder was not then available and the colloquy followed. This entire colloquy should have taken place in the absence of the jury, but having been initiated by the defense counsel, we cannot say, under the circumstances, that the error was of sufficient import to constitute the denial of a fair trial to the defendant.

The defendant filed a petition for writ of habeas corpus pending the appeal of this case, which was consolidated for hearing with the appeal. The determinations of the issues on this appeal are conclusive of all the arguments asserted in support of the issuance of the writ. The petition for writ of habeas corpus is therefore denied.

For the reasons heretofore stated, the judgment entered by the trial court is affirmed.

ALL CONCUR.

———————

Februrary 8, 1966. Petition for rehearing denied.