[No. 38197. En Banc. March 17, 1967.]

THE STATE OF WASHINGTON, *Respondent,* v. FRANK A. DREW, *Appellant.**

*Reported in 425 P.2d 349.

*Neil Hoff* and *Keith McGoffin,* for appellant (Appointed counsel for appeal).

*John G. McCutcheon* and *Don R. Smith,* for respondent.

FINLEY, C. J.—The defendant, Frank Allen Drew, was convicted of the crime of murder in the first degree and sentenced to life in prison for his alleged participation in a robbery in which a human being was killed. On this appeal, he makes four assignments of error. One assignment alleges that the state failed to establish the corpus delicti, another relates to a jury instruction which allegedly placed the burden of proving his innocence on the defendant, and the other two relate to the admission into evidence of a confession which was allegedly obtained in violation of the defendant's constitutional rights.

A somewhat lengthy recitation of the unusual fact pattern in the instant matter is necessary in order to understand the issues raised. In June of 1964, Tom Page, who had emigrated from Yugoslavia as a younger man, was 68 years of age. He was a successful South Tacoma businessman and lived alone. On July 13, 1964, various friends of Mr. Page, not having seen him for about 2 weeks, reported his disappearance to the police. The police proceeded to inspect Mr. Page's house. They found that the house had been ransacked and that the contents of drawers in the bedroom had been dumped on the floor. There was spoiled food in the kitchen. There were a number of bloodstains on the floor and walls, and near the front door was a particularly large one which had been covered with a rug; there were bloody smears along the wall of the hall leading to the bedroom, a bloody handprint on the doorjamb leading to the bedroom, and various bloodstained items in the bed-

room. Dr. Charles Larson, a noted pathologist, identified the blood as human blood. Understandably enough, the police suspected foul play.

On August 25, 1964, the defendant, Frank Drew, was arrested on an unrelated burglary charge and detained in the Tacoma city jail. A day or two later, an attorney was appointed for Drew, and trial on the burglary charge was set for October 21, 1964. Apparently at this time, the attorney for a James Maillard, who was also incarcerated in the Tacoma city jail on a burglary charge, approached the Tacoma police with the news that his client might have some information in regard to the disappearance of Tom Page. The police learned from Maillard that Drew had mentioned that he knew where Tom Page's body was buried.

A microphone was hidden in a cell and connected up to a tape recorder in another part of the Tacoma city jail. Drew and Maillard were then moved into the "bugged" cell. (The record gives no indication that the police solicited Maillard for the part he was to play.) During this time, a police official contacted the attorney for the estate of Tom Page. At the official's request the attorney obtained court approval for the offering of a $1,000 reward for information as to the whereabouts of Mr. Page. Shortly after the reward offer was announced, the burglary charges against Maillard and Drew were dismissed, and they were released from jail within a short time of each other. The two men had spent 5 days together in the "bugged" cell.

The day after his release, October 21, 1964, Drew called an acquaintance on the Tacoma Police Department in regard to the reward offer. The officer, Drew, and his brother-in-law drove to a wooded area about 10 miles from Yelm. Without any hesitation, Drew led them through some brush and down what may have been a deer trail to an unmarked grave. Other officers were called. The body was exhumed and taken to a mortuary for identification and autopsy. Drew was taken back to the Tacoma city jail. The time was then approximately 3 p.m.

Detectives Strand and Zatkovich attended the autopsy and identification of Page's body. They then returned to police headquarters and at approximately 9:30 p.m. they began the first police interrogation of Frank Drew in regard to Page's death. Detective Zatkovich testified that, before the interrogation began, Drew was warned that he had the right to remain silent, that anything he might say could be used against him, and that he had the right to have an attorney. It seems to have been conceded, even at the prehearing (on the admissibility of the confession) where Drew himself testified, that the warnings were given at this time. According to the detectives, Drew stated that he realized he had those rights, and he proceeded to tell ·his story. Drew first insisted that the general location of the grave had been pointed out to him by one Gary Farrar as the two of them drove by the site in a car. After a while, the detectives told Drew they knew he was not telling the truth, that they had other information. Reference was made to the fact that his cell had been "bugged." Apparently, at Drew's request, a portion of the tape was played to him. That part of the tape apparently contained nothing incriminating, but undoubtedly it did convey vividly to Drew the fact that his cell had been "bugged." A new set of warnings was then given to Drew by the detectives. He then admitted having been present during the attack on Page and at the burial; in fact, he told essentially the same story which subsequently was embodied in his signed confession. The entire interrogation—the only one Drew encountered on the day of his arrest—lasted about 1 hour and 50 minutes.

On the next morning, Drew was taken before Pierce County Justice of the Peace Shackleford. The charge against him was read. The charge at this time accused Drew of actually doing the beating of Page, although it was later changed to allege that Drew aided and abetted Gary Farrar in the robbery and killing of Page. Drew was handed a form by Judge Shackleford which set forth his rights, although it stated that any lawyer he obtained

would have to be acquired at his own expense and on his own initiative. The form was so worded because Judge Shackleford, as a justice of the peace, had no authority to appoint counsel. It seems extremely unlikely that this could have misled Drew, however, for several reasons. In the first place, Judge Shackleford's testimony at the prehearing on the admissibility of the confession establishes that, before Drew made any statement, the prosecutor, in Drew's presence, explained that Drew was being charged as an accessory, not as the one who inflicted the injury, and that counsel would or could be appointed for Drew on the following day in superior court. In the second place, Drew had been given a similar form by Judge Shackleford when he was before her on the burglary charge less than 2 months before, and counsel had been appointed for him in that case shortly afterward in superior court. In the third place, Drew himself testified at the pretrial hearing that when the form was given to him, "I never read it. I just glanced through it." We must thus conclude that a form to which Drew paid little if any attention could not have misled him in view of oral statements by the prosecutor and his own previous experience.

Drew denied to Judge Shackleford that he had done the actual beating of Page and stated that Gary Farrar had done it. Later in the day, Drew, after receiving yet another warning of his rights, dictated and signed the written statement which, after the pretrial hearing, was admitted into evidence at his trial.

In his confession, as presented at the trial, Drew stated that the following events had occurred: On the night of June 30, 1964, Frank Drew was driving around Tacoma with Gary Farrar in Farrar's car. The subject of obtaining money arose. Farrar mentioned the name of Tom Page, who was known to be living alone. Apparently, Farrar had "rolled" Page for money previously, and Page had not reported the matter to the police. Farrar and Drew arrived at Page's house between 11 p.m., and midnight. The house was dark. Farrar took a tire iron from the car, and he and

Drew went to Page's door and began beating on it. Page eventually came to the door, without opening it. In response to Page's query as to the identity of his visitors, Farrar swore and told him it was the police. Page opened the door. He was greeted by a blow in the face with the tire iron. Farrar beat Page over the head several more times with the tire iron until the old man fell to a half-sitting, half-lying position on the floor. The attackers asked Page where his money was, but he had begun muttering in his native language. Farrar therefore kicked him several times in the ribs.

Farrar and Drew ransacked the bedroom and the kitchen of Page's house. Eventually, Drew discovered a coffee can containing about $20. Farrar picked up two rings, one containing a diamond and the other a red stone. Before leaving the house, Farrar kicked Page additional times, bringing the total to some place between 15 and 30 kicks. They left Page bleeding and muttering incomprehensibly, and in the same half-sitting, half-lying position into which he had fallen.

The two young men parted. On the next day, Farrar came to see Drew early in the afternoon. Farrar told Drew that he had returned to Page's house that morning; that the old man had made it to his bed, but was now dead. That evening, the 1st of July, Farrar and Drew took Page's body from his house and buried it, first, in a roadside park, and then, in a wooded area near Yelm. The second grave was dug quite away off the road—through some brush and down what may have been a deer trail. The grave was carefully covered with dirt.

According to Drew, Farrar had the diamond ring appraised at a pawn shop. The value of the ring was set at approximately $500, and a $50 loan was offered. They did not pawn the ring, however, and Farrar told Drew that he, Farrar, planned to throw both rings off the Narrows Bridge. Shortly thereafter, on or about July 9, 1964, Gary Farrar was killed in an automobile accident.

The first contention of the defendant is that the state's evidence failed to establish the required corpus de-

licti. The corpus delicti in a homicide case is composed of two elements: (1) the fact of death, and (2) a causal connection between the death and a criminal agency; *State v. Lung, ante* p. 365, 423 P.2d 72 (1967); *State v. Little,* 57 Wn.2d 516, 358 P.2d 120 (1961). It is the defendant's position that the state failed to establish the requisite causal connection between the beating by Farrar and the death of Page. Also cited is *State v. Dildine,* 41 Wn.2d 614, 621, 250 P.2d 951 (1952), where we stated:

> The extrajudicial confession of a person charged with the commission of a crime, standing alone, is not sufficient to establish the *corpus delicti.* However, if, as in this case, there is independent proof thereof, such confession may then be considered in connection therewith, and the *corpus delicti* may thus be established by a combination of the independent proof and the confession.

The state, in the instant matter, presented sufficient independent evidence to support the confession; *e.g.,* the bloodstains at Page's house, the fact that various drawers had been ransacked, the discovery of Page's body in the place indicated, and the testimony of a pawnbroker that Farrar and Drew approached him for an appraisal of two rings which fit the description of those stolen from Page's house. Thus, both the confession and the independent evidence may be considered in determining whether the necessary causal connection has been established.

The defendant points out that, even considering the confession, it is still possible to speculate that Page did not die of the blows inflicted in Drew's presence by Farrar on the night of June 30, 1964. Farrar, or some third party, could have finished the job the next day; or Page could have died accidentally or of natural causes, or so one can speculate. The defendant's real point here is that the state's medical testimony did not conclusively establish that Page died because of the beating. The defendant particularly emphasizes the testimony of Dr. Wicks, the pathologist who performed the autopsy, when he testified on cross-examination as follows:

MR. HOFF: So it is your testimony, Doctor, that from your autopsy report and your medical examination, you are unable to state to the jury with any reasonable medical probability, the reason for the death of the body you examined? DR. WICKS: Well, there was no overt cause of death, that was evident to me. MR. HOFF: Anything would have to be mere speculation, wouldn't it, or possibility? DR. WICKS: Possibility, yes.

Although this and some other portions of Dr. Wicks' testimony do little toward establishing the state's case, it seems that there are several countervailing points in regard to the doctor's testimony as to cause of death. In the first place, Dr. Wicks was effectively warned toward the beginning of his testimony that he should testify within the context of reasonable medical probability.[1] Secondly, when the prosecution, on direct examination, posed a hypothetical question based upon the beating described in the confession and Dr. Wicks' findings from the autopsy on Page's body, the doctor responded:

[It] would seem reasonable to me that a beating would result in shock, which would precipitate a plugging up of the coronary arteries, and the man would die of a heart attack, in effect, from the loss of blood to his heart; since the vessels to the heart muscle are plugged up by the clot, then the heart would stop beating.

Again, on redirect examination, when Dr. Wicks was asked for his opinion as to the cause of death, he stated:

Well, as I pieced things together from looking at the fractures [of the ribs], and what seemed to me to be coronary arteriosclerosis, as well as the finding of this clot which I couldn't be sure about until I had my microscopic work, I felt that it was a reasonable possibility that the man had been beaten and that he had suffered a heart attack. MR. NELSON: Is that opinion bolstered up, or verified by the facts, the hypothetical facts that were

---

[1]We have some doubt about the necessity for such a warning. See *State v. Mooradian*, 132 Wash. 37, 231 Pac. 24 (1924), where we approved allowing a doctor to give his opinion as to how injuries were, or might have been, inflicted. See, also, 7 Wigmore, Evidence § 1976 (3d ed. 1940).

submitted to you? DR. WICKS: Yes. MR. NELSON: The 15 to 30 kicks and hit over the head? DR. WICKS: Yes.

It seems, then, that a substantial portion of Dr. Wicks' testimony, a portion which the jury was entitled to believe, could be summarized as being that, although Page did not die immediately of the beating, and although, because of the decomposed state of the body, it was impossible to state conclusively an overt cause of death, the reasonable medical probability was that Mr. Page died of a heart attack precipitated by shock produced by the beating he received on the night of June 30, 1964, from Gary Farrar. A case relied on by the defendant, *State v. Little, supra,* is authority for our conclusion that there was substantial evidence that the death was the natural or foreseeable consequence of the beating, and thus the required causal connection was sufficiently established.

■ The *Little* case is also relevant here for another reason. In *Little,* there was evidence which, if believed, would have supported a conclusion that the victim died either because of a beating inflicted by the defendant or because of falls from his hospital bed. Although the court indicated that it still would have been possible, although not necessary, for the jury to convict if it found the injuries causing death to have resulted from the falls, the opinion of the court establishes that, where the evidence permits two possible theories as to cause of death and one will support the conviction, the conviction will be upheld.

In the instant matter, there was no evidence—only pure speculation—to support any alternative theory of death. To support the conclusion that the beating caused Page's death, there was the independent evidence of Dr. Wicks' testimony and the fact that Page's bloodstained house evidenced a severe beating. Turning to the confession, there is evidence that Farrar gave Page a severe beating by hitting him over the head with a tire iron several times and by kicking him in the ribs 15 to 30 times. The confession further shows that they left the 68-year-old man bleeding, in a half-sitting and half-lying position, and muttering in-

comprehensibly. The beating clearly inflicted grave injury. There was substantial evidence to support a conclusion that the beating caused Page's death, and the corpus delicti was therefore established.

The defendant's second contention is that the trial judge's instructions to the jury placed the burden of proof on the defendant to prove his innocence. We have considered the instructions complained of, one of which states that causation must be proved beyond a reasonable doubt, and the other which gives the usual definition of proximate cause and states that it can be proved by either direct or circumstantial evidence. We find no error in the instructions given by the trial court. The defendant's proposed cautionary instruction relating to suspicions and suppositions might well have been misleading, and, in any case, the subject was adequately covered by the instructions actually given.

The defendant's most important argument relates to the admission into evidence of his confession which was allegedly obtained in violation of his constitutional rights. He particularly emphasizes the contention that the confession was obtained in violation of his Sixth Amendment right to counsel as established by various recent United States Supreme Court decisions.

Initially, we observe that the disposition of this issue in this case is governed by the Supreme Court's decision in *Escobedo v. Illinois,* 378 U.S. 478 (1964), and not by the decision in *Miranda v. Arizona,* 384 U.S. 436 (1966). In *Johnson v. New Jersey,* 384 U.S. 719, 721 (1966), the Supreme Court clearly stated: "We hold that *Escobedo* affects only those cases in which the trial began after June 22, 1964, the date of that decision. We hold further that *Miranda* applies only to cases in which the trial began after the date of our decision one week ago [June 13, 1966]." The trial in the instant case began on February 15, 1965. Nor are we persuaded that *Miranda* is merely an exegesis of *Escobedo,* and thus the reasoning of *Miranda* should apply to cases such as the present one although its letter does not.

Despite some language in *Miranda* to the contrary, the United States Supreme Court noted in *Johnson*, 384 U.S. at 734, that:

> As for the standards laid down one week ago in *Miranda*, if we were persuaded that they had been fully anticipated by the holding in *Escobedo*, we would measure their prospectivity from the same date. Defendants still to be tried at that time would be entitled to strict observance of constitutional doctrines already clearly foreshadowed. The disagreements among other courts concerning the implications of *Escobedo*, however, have impelled us to lay down additional guidelines for situations not presented by that case. This we have done in *Miranda*, and these guidelines are therefore available only to persons whose trials had not begun as of June 13, 1966.

Turning then to *Escobedo*, we find with some difficulty that the essence of the case is expressed in such statements as:

> We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied "the Assistance of Counsel" in violation of the Sixth Amendment to the Constitution as "made obligatory upon the States by the Fourteenth Amendment," *Gideon v. Wainwright*, 372 U.S., at 342, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial. 378 U.S. at 490-91.

Further on, the court stated:

> We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer. 378 U.S. at 492.

From a careful and detailed review of the record, we conclude that the point at which the process shifted from investigatory to accusatory, the point at which the police inquiry began to focus on the defendant, Frank Drew, as the suspect, was when he led police to the grave of Tom Page. Before that time, it would require great stretching of the imagination to say that the investigation was more than a general inquiry into an unsolved crime. As a matter of fact, before that time, the police had no definite evidence that any particular crime had been committed.[2] Previously, Drew had only indicated to Maillard, and thence to the police, that he knew something about where Page's body was—he had not implicated himself at all in a possible crime. Undoubtedly, the police were interested in his ostensible information, but the degree of significance which the police could attach to Drew's statements seems doubtful. Even Drew's inquiry into the reward in no way implicated him definitely or it would not have been made. But when

---

[2]The dissent quotes a portion of a statement by Mr. Nelson, the deputy prosecuting attorney. Mr. Nelson made the statement at the pretrial hearing in response to a defense claim that Drew had been interrogated at length concerning Page's disappearance prior to Drew's release on the burglary charge. The dissent apparently uses the quoted sentences for the proposition that the accusatory stage had been reached for Drew before he was released and led police to the grave site. Enough of the statement to put the portion quoted by the dissent in context is set forth below, with those sentences omitted by the dissent appearing in brackets:

[While the defendant was held in confinement on the burglary charge he was at no time interrogated by the police department in connection with the death of Tom Page. We did have information as of the 24th of September which would have connected Frank Drew to the death of Tom Page, if the statements of the informant was true and if a crime had been committed. At this time we didn't have a body. We didn't know, we felt there was foul play, but we had no proof of that. We were not prepared to make accusations and we were not sure homicide was committed at all.] If the information we had was true, it was necessary to find the body of Tom Page and Frank Drew was the only person who knew of the burial site. It was necessary to let him believe he was not a suspect. [The actions of Frank Drew in locating the grave for the reward offered belies claims of counsel that he was interrogated for long and unreasonable hours prior to the charge of homicide.] We purposely did not talk with him because we wanted to let him believe he was not a suspect.

Drew led the police directly to the grave, without any hesitation, and the grave was found to contain Tom Page's body, it became clear that Drew had firsthand knowledge of the burial. And a surreptitious burial out in the woods denoted some implications of guilt. At that point, the critical accusatory stage envisioned by *Escobedo* had been reached.

Following the exhumation of the body, Drew received his first police interrogation into the matter that night at about 9:30 p.m. The practically unquestioned testimony establishes that Drew was carefully and fully advised of his right to remain silent, that anything he said could be used against him, and of his right to counsel before the accusatory interrogation began.[3]

The defendant would like to have us discover or establish the critical stage in this case at or before the time that Drew and Maillard were put together in a cell. We find no basis for such a determination. The testimony of the police officers involved shows that they had some suspicions about *both* Drew and Maillard, and perhaps others, but they had neither a definite suspect, nor were they certain as to exactly what type of crime they were investigating. Apart from the testimony of the police officers, we find no indication in the record of any evidence which would be sufficient to make the police believe that anyone was a prime suspect at this time. As for the "bugging" of the cell: it was part of the general investigation into a possible crime, in particu-

---

[3]Detective Zatkovich so testified, and Drew admitted at the pretrial hearing on the admissibility of the confession to being advised of his rights prior to the beginning of the interrogation. The trial court found it to be an undisputed fact that Drew had been advised of his rights before the beginning of the first interrogation.

The trial court further found that Drew made no request for an attorney. This finding was also supported by the testimony of Detective Zatkovich. Although we are compelled to make an independent examination of the record in view of the fundamental constitutional rights involved, we are entitled to attach great significance to the trial court's findings. *In re McNear v. Rhay*, 65 Wn.2d 530, 398 P.2d 732 (1965); *Haynes v. Washington*, 373 U.S. 503 (1963). Our review of the record leads us to agree with the trial court's findings on the points discussed.

lar, an attempt to overhear the conversations of two people who seemed to have some relevant information; but it does not mean that Drew was the suspect.

The defendant has made much of the fact that it is by a rather intricate legal concept that one who aids and abets a robbery becomes a principal and is therefore guilty of first degree murder when a human being is killed during the course of a robbery. He particularly emphasizes the following passage from the *Escobedo* case:

> Petitioner, a layman, was undoubtedly unaware that under Illinois law an admission of "mere" complicity in the murder plot was legally as damaging as an admission of firing of the fatal shots. . . . The "guiding hand of counsel" was essential to advise petitioner of his rights in this delicate situation. 378 U.S. at 486.

While we doubt that Drew understood the technical language by which one who aids and abets becomes a principal, or the further niceties of the felony-murder rule, the testimony shows that Drew was told and that he realized this was a murder case and that he was "just as involved as Farrar." Although Drew failed to complete a grade beyond the ninth in school, the evidence shows that he was a 23-year-old man of normal intelligence who got mainly "C's" in school, and who was well acquainted with the machinery of criminal procedure from past experience—one example of his acquaintanceship being his experience on the burglary charge a few months before the interrogation concerning Page's murder. Drew's testimony at the prehearing also demonstrates that he understood what was going on around him. Under all of the circumstances in the instant case, we conclude that Drew understood the situation facing him, was carefully advised of his rights, and that he made an intelligent, voluntary decision to proceed with his conversation with the police without the assistance of counsel. The resulting confession was admissible as evidence under the *Escobedo* rule and under our own law. See *State v. Cole*, 67 Wn.2d 522, 408 P.2d 387 (1965), and *State v. Darst*, 65 Wn.2d 808, 399 P.2d 618 (1965).

■   The defendant also cites *Massiah v. United States,* 377 U.S. 201 (1964), in support of his position on the question of the admissibility of his confession. *Massiah,* of course, has the one similarity to the instant matter that the accused's statements were overheard without his knowledge by means of an electronic listening device. There the similarity ends. In *Massiah,* the defendant was under indictment, had retained counsel, and was out on bail. The importance of these distinguishing elements is established by the fact that *Massiah* was a right-to-counsel case. In the majority opinion, 377 U.S. at 205-06, the court states:

> Here we deal not with a state court conviction, but with a federal case, where the specific guarantee of the Sixth Amendment directly applies . . . . We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.

At another point in the *Massiah* opinion, the court relies on *Powell v. Alabama,* 287 U.S. 45 (1932), for the conclusion that it was at the *critical stage* of the proceedings against Massiah that the electronic eavesdropping device was employed. Thus, it seems clear that *Massiah* is merely a precursor of *Escobedo* in interpreting the right to counsel, and that *Escobedo* amplifies the earlier decision. It has already been pointed out above that at the time Drew's cell was "bugged" the inquiry of the police into Page's death was merely a general investigation, and the critical, accusatory stage when the right to counsel and the need for warnings attached as to the murder charge had not been reached.

The tapes made of the conversations between Drew and Maillard in their cell were not introduced into evidence, and their present condition is apparently such that it is largely impossible to tell what information they contained, much less if they contained incriminating statements. A short portion of the tapes was played to Drew during the course of his interrogation; however, it seems apparent that

the knowledge that his cell had been "bugged" had some effect on his decision to change his story. We have studied various United States Supreme Court decisions to determine the status of such recordings of electronic eavesdropping during the course of an investigation. Those cases which have been reversed for the admission of such electronically obtained information, such as *Silverman v. United States*, 365 U.S. 505 (1961), where a "spike mike" was inserted through a party wall to make contact with the heating duct serving the defendant's house, have relied on the presence of a trespass or intrusion in violation of the Fourth Amendment.

In *On Lee v. United States*, 343 U.S. 747 (1952), however, a conviction was upheld when incriminating statements were obtained by a "wired for sound" former acquaintance of the defendant who had turned informer and who entered the defendant's business establishment and engaged him in conversation. And in *Lopez v. United States*, 373 U.S. 427 (1963), a conviction was upheld where an internal revenue agent, pretending to play along with bribe offers, recorded incriminating information in the defendant's office by means of a hidden pocket wire recorder. The court's reasoning was that the device was not planted by means of an unlawful physical invasion under circumstances which would violate the Fourth Amendment.

Another relevant decision of the United States Supreme Court is *Lanza v. New York*, 370 U.S. 139 (1962). In that case the defendant visited his brother in jail. Their conversation was overheard and transcribed by means of electronic equipment. Although it was not necessary for the decision of the case, the court (at 370 U.S. 143-44) made the following statement:

> Yet, without attempting either to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the

order of the day. Though it may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection, there is no claimed violation of any such special relationship here.[4]

A consideration of the Supreme Court's decisions in *Massiah, On Lee, Lopez,* and *Lanza,* convinces us that there is at least presently no constitutional prohibition against the use in evidence of such recordings as those made here of the jail cell conversation between Drew and Maillard. A review of our own decisions convinces us that the recordings under discussion would have been admissible. *State v. Cole,* 67 Wn.2d 522, 408 P.2d 387 (1965), and *State v. White,* 60 Wn.2d 551, 374 P.2d 942 (1962), established that, when the constitutional issues are favorably resolved, recordings made without the defendant's knowledge while he is in police custody can be admitted into evidence. Since it is our conclusion that the recordings would have been admissible as evidence against the defendant here, we have no occasion to determine whether the derivative use of inadmissible recordings in obtaining a confession would render the confession inadmissible.

Although the remarkable fact pattern before us in the instant matter displays elements of police ingenuity, we would be remiss if we allowed this opinion to be construed as a *carte blanche* approval of the surreptitious use of electronic recording devices in the jails of this state. Police officials have been given warning by the United States Supreme Court that the present constitutional status of

---

[4]This court's decision in *State v. Cory,* 62 Wn.2d 371, 382 P.2d 1019 (1963), is consistent with the exception recognized by the Supreme Court for "relationships which the law has endowed with particularized confidentiality." In *Cory,* it was held that the use of an electronic eavesdropping device to overhear a conversation between the defendant and his attorney, while the defendant was in jail, amounted to a denial of the right to effective counsel. In the instant matter, as in *Lanza,* there is no claimed violation of any such special relationship.

such activities is of doubtful permanence.[5] This decision may properly be construed as another warning as to the questionable status of such police techniques under the federal constitution in the future.

After careful review of the record in view of the policies and holdings of our decisions and those of the United States Supreme Court, we find no reversible error.

The judgment is affirmed.

HILL, ROSELLINI, OTT, and HUNTER, JJ., concur.

WEAVER and HAMILTON, JJ., concur in the result.

LANGENBACH, J. †(dissenting)—The defendant was convicted of murder in the first degree and has appealed. The facts are not seriously in dispute. Resolving any such dispute against the defendant still leaves serious legal issues. The correct resolution of these issues is of signal importance to the administration of justice in this state. The conviction that these important issues have been incorrectly resolved by the majority compels this dissent.

On the night of June 30, 1965, defendant and one Gary Farrar went to the home of Tom Page for the purpose of extracting money from him. Farrar armed himself with a tire iron and rapped on the door. Page came down in his

---

[5]The separate opinion by Mr. Justice Brennan, joined by the Chief Justice and Mr. Justice Douglas, in *Lanza*, 370 U.S. at 150, makes the following observation:

The tenor of the Court's wholly unnecessary comments is sufficiently ominous to justify the strongest emphasis that of the abbreviated Court of seven who participate in the decision, fewer than five will even intimate views that the constitutional protections against invasion of privacy do not operate for the benefit of persons—whether inmates or visitors—inside a jail, or that the petitioner lacks standing to challenge secret electronic interception of his conversations because he has not a sufficient possessory interest in the premises, or that the Fourth Amendment cannot be applied to protect against testimonial compulsion imposed solely as a result of an unconstitutional search or seizure.

†Judge Langenbach is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

nightclothes and inquired who was there. Farrar answered, the police. When the door was slightly opened, Farrar forced his way in and struck Page on the head with the iron, knocking him down. He then kicked the man repeatedly in an attempt to learn where Page kept his money. The culprits found $20 and, taking two rings, left. Page, bleeding profusely, was left half-sitting, half-lying on the floor.

The next day Farrar returned to Page's home, evidently for more money. He reported to the defendant later that he had found Page dead in bed. The two then used Page's automobile to dispose of the body. It was buried in a crude grave out in a wooded section of Pierce County.[6]

During August 1965, defendant was lodged in the Tacoma city jail on a charge, unconnected with this case, of burglary. He was represented by assigned counsel in that case. At the same time, in another cell, was one James Maillard. He was also charged with a burglary and represented by assigned counsel.

Early in August, the police were in the process of investigating Page's disappearance. They had been advised about his disappearance and had found his home spattered with blood. They suspected foul play. The defendant was then questioned by them about certain rumors concerning threats reportedly made by Farrar to rob Page. Defendant denied any knowledge.

On September 24, Maillard, on advice of his counsel, relayed to the police not merely the information that Drew admitted to knowledge of the location of Page's grave, but that Drew admitted to having helped dispose of the body. At the suggestion of a lieutenant of detectives, a very special cell was prepared in the Tacoma city jail; it was "bugged". A microphone was placed over a ventilator to enable the police to monitor and record all conversations taking place in the cell. Then, Maillard and defendant were

---

[6]On July 9, Farrar died a violent death as a result of an automobile accident in Oregon.

placed together in this single cell, the bugged cell.[7] The record does not disclose that defendant knew of this bugging. Apparently his attorney was equally unaware.[8] As noted by the majority, whether the police informant Maillard was instructed as to the nature of his mission is a question not answered by the record. It would be difficult under the circumstances, however, to believe that Maillard (and his counsel) did not understand the significance of being placed in the same cell with the man against whom he had informed. Thereafter, these two engaged in conversations, as cellmates will. At least 80 hours of their conversations were recorded.[9]

After 5 days, apparently enough information had been obtained because the police put aside their electronic devices and resorted to a new tack. First, they requested the attorney handling the Page estate to offer, publicly, a reward of $1,000 for information about Tom Page. They intended to release the defendant in the hope that he would rise to this attractive bait.

Shortly after the reward was advertised (in fact, the day before the defendant was to be tried for burglary) that action against defendant was dismissed and he was sent home, ostensibly a free man.[10] At the pre-trial hearing of this case, the deputy prosecuting attorney admitted:

If the information we had was true, it was necessary to find the body of Tom Page and Frank Drew was the only person who knew of the burial site. It was hoped he would be released and lead us to this location. It was

---

[7]Detective Stark gave two reasons for this move: (1) the two inmates requested it(!) and (2) to obtain information *"on a murder."*

[8]The following testimony should be noted: "Q. And despite the fact that the court had appointed an attorney to represent him, and he did have such a court-appointed attorney, you still went ahead with these investigations in the bugging of his cell? A. [Detective Strand] *Well, if he has an attorney, I guess that is all right.* Q. As long as he has an attorney it is all right to bug his cell? A. Well, *regardless."*

[9]Maillard now disappeared from the case. He, too, before trial, died as the result of an automobile accident.

[10]This dismissal had the effect of discharging his attorney. From this point forward, defendant was unrepresented by counsel.

necessary to let him believe he was not a suspect. . . . We purposely did not talk with him because *we wanted to let him believe he was not a suspect in the death of Tom Page.* (Italics mine.)

The efforts of the police were rewarded the next day when Drew, in hope of obtaining the reward, led them to the spot where the body of Tom Page was hidden. The body was removed from the crude grave and defendant was returned to the city jail where he was booked at 2:30 p.m. There he was placed in silent seclusion for the next 7 hours. At 9:30 p.m., two experienced homicide detectives arrived to interrogate him. They had with them a tape recorder and set it working. For the next hour and 50 minutes, they continued their interrogation. They testified that at the beginning and several times during this period, defendant was advised of his right to counsel, to remain silent, and the fact that anything he said could be used against him.[11] The majority relates that "According to the detectives, Drew stated that he realized he had those rights, and he proceeded to tell his story." Unnoted was the defendant's testimony:

Q. Did they advise you that before you made any confession you should have an attorney present? A. Not at that time. At first, when they first questioned me they did. At that time, they said on that—I told him, I have nothing to say, I want to go up to my cell, and I want an attorney. I started to get out of my chair. They told me to sit down, they wouldn't let me leave. Q. After that didn't—did they tell you you had the right to have an attorney? A. Not after that, no.

Thereafter, for at least 1 hour, defendant resisted their questioning, insisting that Farrar had merely pointed out the grave site to him. Then, late at night, the two detectives, having during this hour softened up the solitary defendant, played their trump-card, the tapes of the bugged

---

[11]Yet that portion of the interrogation tape which was played at the trial in an attempt to secure its introduction contained not a syllable of such an admonition.

conversations.[12] The defendant testified at the pre-trial hearing:

They said they had tapes from Jim and I being in the same cell together, and they brought one of them out and played part of it, and they said they had also a confession from Jim stating that they knew everything about Jerry Farrar and I being involved in this, and they said there was no sense trying to hide it, that they had everything they needed.

At this point, defendant told his interrogators that he had not assaulted Page, but had participated in the robbery, and that on being later told of Page's death, had helped dispose of the body. He was then questioned for another 50 minutes until he had revealed enough to satisfy the detectives.

Early the next morning, defendant was taken before a committing magistrate (a justice of the peace). The justice, by way of advising him of his constitutional rights, handed the defendant a form which purported to set out those rights.[13] That form in part recited:

[R]epresentation by a lawyer. We have no authority to appoint one or pay for his services. *If you are to have one, it must be on your own initiative and at your expense.* (Italics mine.)

The charge, which was then read to defendant, accused him of having actually beaten Page.[14] Drew, in understandable response, made a statement to the justice that Farrar had done the actual beating, thus further incriminating himself.

Following this appearance, Drew was taken to a secretary. He was there required, after having been advised of his rights, to make what was in effect his third confession. The statement was typed and signed. It was later to be

---

[12]A detective testified that they used the bugged cell for any information they could get and that they use such tapes "psychologically and so forth."

[13]It will be recalled that defendant stood before the justice charged with a capital crime.

[14]The information later filed corrected this to allege that Drew had aided and abetted Farrar in that grisly crime.

admitted into evidence at his trial over his motion to suppress.

At the trial, the burden was on the state to prove that Page had died as a result of the beating administered by Farrar. The state used both the confession and other evidence in an attempt to establish the necessary causal connection. The evidence most heavily relied on was the testimony of a pathologist. The majority cites two portions of his testimony in support of their conclusion that from the testimony a jury could conclude that "the reasonable medical probability was that Mr. Page died of a heart attack precipitated by shock produced by the beating he received. . . . "

The first portion of the pathologist's testimony is interpreted by the majority as the doctor's "response" to a hypothetical. The testimony in fact proceeded as follows:

> Q. [Hypothetical question, alluded to by majority, is put] A. Well, I should state that from the results of my autopsy, *I found no direct cause of death.* Q. There were no other causes of death? A. This is true. However . . . . [And then, at this point, the witness recites what the majority interpret as his response to the hypothetical.] (Italics mine.)

The majority's second supportive quotation of testimony was elicited on redirect, and although it comes later in the testimony, it refers to what the doctor thought about a certain blood clot *before* he did his microscopic work on it. The state specifically asked him to give his opinion at the time just after he had performed the post mortem. With regard to his conclusion *after* he had done the microscopic work, he testified:

> I found the blood clot which I was uncertain as to whether it was of such a nature that it would have been there before death or after death. In order to confirm this, I removed this part of this artery, and did microscopic work with it. There is—my results of the microscopic work are just as inconclusive as the results of looking at it at the time of the autopsy. The material that formed the clot within this artery was so decomposed

that I couldn't be sure whether it had occurred before death or after death.

With regard to that clot, the doctor's further testimony is of such importance that it is difficult to understand how it escaped the attention of the majority:

> Q. Did that lead you to conclude, doctor, that the probabilities are that the clot didn't cause the death, by the fact that it washed away? A. Well, it was just another bit of information to lead me to *the conclusion that I don't know why he died.* . . . Q. And you were able to find no evidence of a medical nature that could lead you to a conclusion that beatings had caused his death? A. That is true. . . . Q. So is it, you were not able to find any evidence of beatings that were so severe that they could cause his death, were you? A. That is true. (Italics mine.)

(1) *Denial of Counsel:*

Even if we accept the majority's establishment of the critical stage at the grave side of Tom Page, the fact remains that the defendant was thereafter closely interrogated with the purpose of extracting from him a confession. The issue then, is whether he knowingly and intelligently waived his privilege against self-incrimination and his right to counsel before making the written confession which was introduced at trial. *Escobedo v. Illinois*, 378 U.S. 478, 12 L. Ed. 2d 977, 84 Sup. Ct. 1758 (1964).[15] The majority hold that "he made an intelligent, voluntary decision to proceed with his conversation with the police without the assistance of counsel." Yet, the facts reveal that defendant made his written confession to a capital crime shortly after he was told by a judicial officer of the state that if he was to have an attorney, he must be able to pay, *ergo*, that he was not to have one. This "explanation" was the "illumination" with which defendant was left to interpret the statement made when he was taken to confess before a stenographer

---

[15]The trial court interpreted *Escobedo* as follows: "The Court feels that . . . the Escobedo case, is not in point . . . . The Court is satisfied that the Escobedo case . . . has to be confined to the facts of the case, and that they are not similar to the facts in this case."

that he had a right to an attorney. The majority says he was not misled because he had once before been represented by appointed counsel. In other words, what the judicial officer of the state did not know, the defendant of ninth grade education was presumed to know because at a different time, under different circumstances and by a different agency[16] an attorney had been appointed to represent him. It is inconceivable that the court should presume that a defendant knew his rights after a judicial officer of the state specifically advised him that he did not have them. How could he in reason be presumed to have waived a right the existence of which, he was told, turned on wealth he did not possess? Defendant's indigency compelled him to acquiesce in the absence of counsel. That is *not* a "voluntary decision to proceed . . . without the assistance of counsel."

Because defendant was denied counsel at a critical stage, and in the absence of such counsel confessed, that confession is not admissible in our courts.

While not necessary to this conclusion there are two other reasons which require us to suppress that document. The first is that the critical stage in this case came when the defendant was placed in the bugged cell. The police, at that point, knew that Page had disappeared, that his home was spattered with blood, and that "Frank Drew was the only person who knew of the burial site." The majority states that the bugging "does not mean that Drew was the suspect." Apparently, emphasis is to be placed on the word "the". But there were two suspects in this case. As the state admitted at trial:

> At the time the cell was bugged, *there were two suspects, two primary suspects, James Maillard and Frank Drew.* James Maillard had information, and it was so accurate, that we couldn't believe that a man could have that much information without being implicated. He implicated Gary Farrar and Frank Drew. James Maillard was not really absolved of this situation until Frank Drew confessed . . . . (Italics mine.)

---

[16]Superior Court.

And at the pre-trial hearing, Detective Zatkovich was asked on cross-examination: "Q. So he was a suspect, was he not? A. That is correct."

At that point, Drew not only had a right to have an attorney, *he in fact had an attorney.* Yet his cell was bugged and the fruit of that effort was employed to extract his confession. There were taken from him at this critical stage his own incriminating words which the police deliberately extracted from him in the absence of his counsel. *Escobedo, supra; Massiah v. United States,* 377 U.S. 201, 12 L. Ed. 2d 246, 84 Sup. Ct. 1199 (1964). This illegally obtained information was then used to induce a confession which is thereby similarly poisoned. *Wong Sun v. United States,* 371 U.S. 471, 9 L. Ed. 2d 441, 83 Sup. Ct. 407 (1963). The police, having been successful in this effort, would now have us believe that the 80 hours of bugged conversations were quite nonincriminating. This self-serving testimony scarcely squares with other testimony given by them to the effect that when they played part of the tape the defendant capitulated and told all. Secondly, this record, from beginning to end, reveals the police weaving a web of deception, the purpose of which was to trap the defendant into confession and thus to avoid the inconveniences raised by his constitutional rights. The strands of that web cast a sinister shadow over the lives of the people of this state, innocent as well as guilty. Here the state of Washington is revealed procuring a bugged cell, procuring a "friend" to share it, procuring a reward to bait their hook, inducing a confession by playing the tapes of the bugging, charging defendant with the wrong crime and advising him that he had no right to appointed counsel. The policy behind the exclusionary rule is the refusal of the state to play the criminal's game. There is a Plimsoll line of decency which indicates the depth beyond which the dignity of the state will not allow its officers to sink. That line has been passed in this case.

(2) *Failure to prove Corpus Delicti:*

The state had the burden of proving corpus delicti:

(1) The fact of death, and (2) a causal connection between

the death and a criminal agency. *State v. Lung, ante* p. 365, 423 P.2d 72 (1967); *State v. Little,* 57 Wn.2d 516, 358 P.2d 120 (1961).[17] The state, in attempting to prove a causal connection between the death of Page and the beating by Farrar (and therefore the guilt of Farrar's co-felon Drew) relied upon the confession, independent proof supporting that confession,[18] and the testimony of the pathologist, Dr. Wicks. Even with the confession there is grave doubt that the state met its burden of proving corpus delicti. Without it, we are left with the testimony of Dr. Wicks. Regarding the death of Page, Dr. Wicks testified: *"I don't know why he died."* Not only did he find no medical evidence that the beatings caused the death, but he in fact could find no evidence of any beatings severe enough to cause death! That leaves us with a bloodstained floor, ransacked drawers and a pawnbroker's testimony, none of which is relevant to the issue of corpus delicti.

The case must be sent back for a new trial in which the illegally obtained confession is not used and in which the corpus delicti is proved.

DONWORTH, J. (dissenting)—I concur with the foregoing dissenting opinion, but wish to add briefly to what is stated therein.

The burden is on the state to establish the corpus delicti beyond a reasonable doubt. *State v. Little,* 57 Wn.2d 516, 358 P.2d 120 (1961); *State v. Fry,* 39 Wn.2d 8, 234 P.2d 531 (1951); *State v. Anderson,* 10 Wn.2d 167, 116 P.2d 346 (1941). The causal connection between the death of the

---

[17]The majority cite *Little* as establishing that "where the evidence permits two possible theories as to cause of death and one will support the conviction, the conviction will be upheld." In fact, *Little* held that a defendant is responsible for the natural consequences of his acts; that, therefore, *even if* the falls from the hospital bed were the immediate cause of death, the victim was in that bed, unconscious, incoherent and thrashing around *because* the defendant had inflicted upon him a linear skull fracture and a subarachnoid hemorrhage.

[18]Listed in majority opinion as: Bloodstains at Page's house, ransacked drawers, discovery of Page's body in place indicated (which occurred *before* confession) and a pawnbroker's testimony that Farrar and Drew sought appraisal of two rings.

deceased and an unlawful act cannot be supported on mere conjecture and speculation. *State v. Little, supra; State v. Rounds,* 104 Vt. 442, 160 Atl. 249 (1932).

In the present case, Dr. Wick's testimony (which is the sole expert testimony produced by the state on the cause of death) establishes but one thing, to wit, that the cause of Page's death is unknown. In response to a hypothetical question, the pathologist testified, in effect, that a beating such as described therein *could* cause shock, which *could* cause a blood clot, which in turn *could* cause heart attack and death. But his testimony is unequivocal that in this case it was impossible to determine whether the blood clot which he found was formed before or after death. If it was formed after death, obviously it could not have been the cause of death, and the state's entire case as to the cause of death falls.

The testimony relative to the cause of death in this case is similar in many respects to that in *State v. Downing,* 24 Wash. 340, 64 Pac. 550 (1901), in which this court held that the state's evidence was insufficient to justify the finding that the death was the result of a crime. I would hold in this case that the state failed to establish this essential element of the corpus delicti to that degree of certainty which the law requires. The evidence presented on this issue consisted merely of conjecture. Accordingly, as in the *Downing* case, the judgment should be reversed with directions to discharge appellant.

Assuming, arguendo, that the evidence was sufficient to establish the corpus delicti, I also agree that appellant's confession must be excluded. His written statement was not given until after Drew's appearance before a committing magistrate who handed him a printed form which stated that, if he were to have an attorney, he would have to retain one and pay him at his own expense. It is inconceivable to me that, in light of *Gideon v. Wainwright,* 372 U.S. 335, 9 L. Ed. 2d 799, 83 Sup. Ct. 792 (1963), such a statement made by any court to an indigent defendant, standing before it accused of a capital crime, could be approved as

proper advice as to his constitutional right to counsel. This is not a case in which a magistrate failed to advise an indigent accused regarding this constitutional right. Here, the advice given to Drew by the magistrate was diametrically opposed to the applicable rule laid down by the United States Supreme Court in *Gideon*. Drew had a right to rely on the magistrate's advice, even though previously, in another case, he had had court-appointed counsel. Hence, Drew's statement, taken after his appearance before the magistrate was, in my opinion, inadmissible at his trial. Because of this prejudicial error, I would grant appellant a new trial.

August 18, 1967. Petition for rehearing denied.

*Reported in 425 P.2d 669.